UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLEO MARTINEZ-COSTA,

Petitioner,

v.

M. PALLARES,

Respondent.

No.  2:19-cv-02597 KJM KJN P

FINDINGS & RECOMMENDATIONS

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 2014 conviction for first-degree murder and second-degree robbery.  Petitioner was sentenced to prison for the period of life without the possibility of parole.  Petitioner claims:  insufficient evidence to support a true finding of acting with reckless indifference to human life; erroneous exclusion of third-party culpability evidence; ineffective assistance of counsel; and prosecutorial misconduct.  After careful review of the record, this court concludes that the petition should be denied.

//

//

//

//

1

1  II.  <u>Procedural History</u>

2      On April 22, 2014, a jury found petitioner guilty of the following:  first-degree murder

3  (Cal. Pen. Code,[1] § 187(a) [count one]), and found related allegations of being armed with a

4  firearm (§ 12022(a)(1)) and attempted robbery during the commission of murder (§ 190.2(a)(17))

5  to be true; and attempted second-degree robbery (§§ 664/211 [count two]), and also found the

6  accompanying allegation of being armed with a firearm (§ 12022(a)(1)) to be true.  (LD 1 at 27-

7  28; LD 2 at 75-76; LD 9 at 213-14.)  On May 23, 2014, petitioner was sentenced to life without

8  the possibility of parole in state prison.  (LD 1 at 68-69.)[2]

9      Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

10  District.  (LD 10, LD 12 & LD 13.)  The Court of Appeal affirmed the conviction on June 13,

11  2018.  (LD 18.)

12      Petitioner filed a petition for review in the California Supreme Court (LD 19), which was

13  denied on September 19, 2018 (LD 20).

14      On or about April 26, 2019, petitioner filed a petition for writ of habeas corpus with the

15  Sacramento County Superior Court; that court denied the petition on July 26, 2019.  (LD 21.)

16      Thereafter, on August 16, 2019, petitioner filed a petition for writ of habeas corpus with

17  the Third District Court of Appeal.  (LD 22.)  The state appellate court denied the petition on

18  September 12, 2019.  (LD 23.)

19      On September 30, 2019, petitioner filed a petition for writ of habeas corpus with the

20  California Supreme Court.  (LD 24.)  The state's highest court denied the petition on December

21  11, 2019.  (LD 25.)

22      Petitioner filed the instant petition with this court on December 23, 2019.  (ECF No. 1.)

23  Respondent filed an answer on April 16, 2020.  (ECF No. 13.)  Petitioner filed her traverse on

24  May 1, 2020.  (ECF No. 15.)

25  _____

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

26

27  [2] "LD" refers to the Lodged Documents filed by respondent in this court on April 16, 2020; "ECF" refers to this court's electronic case management and filing system.  All numeric page references are to those electrically assigned at the time of lodging or docketing.

28

III. Facts[3]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

## FACTS

In view of the issues raised on appeal, we will here set forth the facts relating to the commission of the charged crimes. Other facts relevant to defendants' claims on appeal will be set forth, post.

### The People's Evidence

On November 25, 2011, around midnight, Breaonna Nunes accompanied "Jimmy" Hiter in his red Cadillac to Hiter's apartment. Nunes paid Hiter $4,000 for either a quarter- or half-pound of methamphetamine, and helped him package additional methamphetamine that he was going to drop off with various buyers.

While Nunes was with Hiter, Hiter received a constant barrage of calls and text messages on his cell phone. When Hiter answered several calls, Nunes heard the same woman's voice on the other line.

At one point, Hiter told Nunes that he was going to deliver methamphetamine to his ex-girlfriend's house. Later in the interview with law enforcement, Costa said that she and Hiter had dated in the past.

Hiter and Nunes arrived at Costa's house, and Hiter parked the car on the side of the road in front of the house. Hiter got out of the car and walked towards the trunk where he kept the methamphetamine in a safe. Nunes then saw a man wearing a mask and wielding a semiautomatic firearm running towards them from the direction of Costa's house. Nunes saw the man rack the slide on his gun, and tell Hiter, "Mother fucker, give me everything you got." Nunes retreated to the driver's seat of Hiter's car and heard a gunshot. Nunes got out of the car and saw Hiter on the ground in front of it. She saw that Hiter had been shot in the area of his lower abdomen.

Nunes then saw Costa who was wearing brown Coach brand rain boots. Nunes heard Costa angrily say something to the effect of, "Where did that little bitch go." Costa then asked Nunes to help her move Hiter's body. Nunes refused, grabbed the car keys out of Hiter's hand, and drove away. She did not call law enforcement.

Angela Law began dating Doria around August 2011. During their relationship, Law often saw Doria with a semiautomatic firearm

---

[3] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Martinez-Costa, No. C076567 (6/13/2018), a copy of which was lodged by respondent as Lodged Document 18 on April 16, 2020. (ECF No. 14-18.)

tucked in the front of his waistband. Doria told Law that he made money by robbing people and selling drugs.

Sometime close to midnight on November 24, 2011, or early in the morning of November 25, 2011, Law met with Doria at his house. They eventually left together in a minivan that belonged to the mother of Doria's children. There was a bicycle and a duffle bag in the back of the van, and Doria told Law that he was going to rob someone. Law saw a semiautomatic firearm in the waistband of Doria's pants.

Doria and Law first went to Hiter's apartment complex. While at the apartment complex, Law saw a "burgundy" Cadillac leaving the complex. Doria was on the phone, and Doria said to the person he was speaking to that he had seen "him" and "he" had just left. Law recognized Costa's voice through the phone. She heard Costa tell Doria that Hiter was "on his way." Doria then told Law that they were going to Costa's house.

Doria parked the van around the corner from Costa's house, and Doria, who was wearing a loose "hoodie," took the bicycle out of the van and rode off on it. A patrol vehicle passed Law as she waited in the van and she sent a text message to Doria that read, "[D]id u see the boys." Law heard a gunshot while she was waiting for Doria.

When Doria returned to the van he appeared anxious, and told her that the gun had jammed. They then drove to a friend's house. Doria and Law left their friend's house to go to a doughnut shop where Law spoke with her father on Doria's cell phone. Her father told her that someone had been killed near Costa's house.

An autopsy revealed that Hiter died from a gunshot that entered his back and traveled into his chest. About $400 was found on Hiter's body.

At the site of the killing, law enforcement officers found a bullet casing along with a live nine-millimeter round. Racking the slide on a semiautomatic handgun ejects a live round if a live round was already chambered. Racking the slide is also a method that can be used to eject a live round that has jammed a semiautomatic firearm. Officers also found a knit cap with "eye holes" cut out at Doria's home.

Towards the start of 2011, Cara Bain lived in a trailer behind Costa's house for roughly six months. She knew Costa and encountered Doria several times at Costa's house. Bain was also familiar with Hiter, having met him when they both attended drug court.

On November 27 or 28, 2011, Becky Collins chaired a meeting at the Serenity House recovery home. After the meeting, Bain approached Collins and said that Hiter's murder was a "robbery gone bad." Bain also related that she had lived with the people who had murdered Hiter. Collins called the police to give them the information that Bain had provided.

4

On December 8, 2011, Detective Donald McCoy and his partner went to the Serenity House and interviewed Bain. Bain recalled that Hiter would go to Costa's house and sell Costa "dope." When at Costa's house, Hiter would show off by exhibiting large quantities of drugs and cash. About one month before Hiter's murder, Costa remarked that Hiter had sold her poor quality drugs and she wanted to rob him. Bain saw Hiter at Costa's house around 10 times, and he sold Costa drugs on each of those visits. Costa sold the drugs that she purchased from Hiter.

Bain also knew Doria because he would go to Costa's to "hang out." Bain described Doria as half-Mexican, half-White, but "more on the white side." There was an occasion when Doria gave Bain a ride to Home Depot. During the trip, Doria told Bain that he had robbed drug dealers in the Bay Area. Bain recalled that Hiter sold Doria drugs on one occasion in Costa's living room. During the deal, Hiter exhibited a large amount of cash and Bain later warned him to be careful around Doria because Doria robbed drug dealers.

During her testimony at trial, Bain denied giving information regarding the murder to Collins. She also denied providing information to detectives in a subsequent interview at the Serenity House. Cara Bain was also referred to as Cara King. A recording of her interview was played for the jury.

Gina Ballejos was Costa's next door neighbor. In November 2011, Ballejos and Costa spoke nearly every day, and used methamphetamine together on occasion. The night of November 24, 2011, and into the early morning hours of November 25, Ballejos and Costa were "partying for Thanksgiving." She did not recall receiving a text message from Costa that told her to not go to Costa's house. The morning of November 25, she heard a gunshot and called Costa.

Officer Henry McClusky was dispatched to Costa's house at 3:50 a.m. the morning of the shooting. Officer McClusky spoke with Ballejos after arriving, and Ballejos informed him that she called Costa at 3:38 a.m., after hearing a gunshot.

Angel McElroy, Costa's daughter, spent November 24, 2011, at Costa's house. She left around midnight. The following day, around 7:30 or 8:00 a.m., she returned to Costa's house after hearing that a shooting had occurred there. She left immediately after learning that Hiter had been murdered, and made several phone calls to Costa and Doria. At that time, according to McElroy, Doria was an acquaintance whom she had not seen for roughly a month prior to the murder. About one month after Hiter's murder, McElroy was dating Doria.

On November 25, 2011, around noon, McElroy received a call from her then boyfriend Jeffrey Hayden. During the phone call, McElroy told Hayden that Doria had murdered Hiter. McElroy explained that her statement to Hayden was based on a conversation with her brother, who did not like Doria and thought that Doria might have "had something to do with it."

5

Detective Mark Johnson testified to cell phone records. He testified that when a call is made or received, it "pings" off a cell tower. Cell tower records show the location of the tower that a particular call was routed through, whether made or received. The cell tower records for Nunes and Hiter's cell phones were consistent with Nunes's account of where she went with Hiter the night he was murdered. The records for Law and Doria's cell phones were consistent with Law's testimony regarding their locations the night of the murder. Records for Doria's cell phone showed that a call was made or received at 3:33 a.m., and the call was routed through a cell tower near Costa's house.

Cell phone records showed that Costa made numerous calls and sent numerous text messages to both Hiter and Doria in the hours leading up to Hiter's murder. At 1:37 a.m. Costa called Hiter. At 1:38 a.m. she sent Doria a text message that read, "I jus cald him n he sai hey hold on a sxec ill call u bac so maby he at home now." At 3:18 a.m. Costa and Hiter exchanged calls and, seconds later, Costa texted Doria, "He call to say he on the road il c u when I c him on camera." At 3:35 a.m. Costa sent a text to Ballejos: "Dont come over." At 3:38 a.m. Law sent a text to Doria: "did u see the boys."

At 3:44 a.m. Costa called 911. In the call, Costa reported that a woman driving a red Cadillac possibly struck Hiter with the car. A recording of that call was played for the jury.

Detective Donald McCoy interviewed Costa on November 25, 2011, and on December 6, 2011.

During the first interview, Costa explained that she had Thanksgiving dinner with her family and was cleaning up late that night when her dog started barking. Costa looked outside and heard the sound of a person snoring. Upon further examination, she saw Nunes get out of Hiter's car. Nunes refused to help Costa move Hiter and, instead, got into the car and sped away.

Costa said that she and Hiter dated for roughly two months about 10 years before Hiter's death. Hiter and Costa spoke on the phone a couple of times that night. Hiter asked Costa if he could come over to her house. Costa admitted that Hiter showed up at her house around 10:00 or 11:00 p.m. Costa asked him to leave, and he said that he would return after the children at the house had gone to sleep. Costa then sent her neighbor Gina Ballejos a text message that told Ballejos to not come over to Costa's house. Costa sent the text anticipating that Hiter would return to her house. Costa did laundry while she waited for Hiter. She never heard a gunshot.

Detective McCoy interviewed Costa on December 6, 2011, to determine whether Costa knew Doria. Costa knew Doria because he was going to repair her heating and air conditioning system. She described Doria as a White male in his late twenties. Costa knew that Doria drove a minivan, and described him as having the mentality of a child and as being "fuckin' crazy." Recordings of the interviews were played for the jury.

6

**Doria's Defense Evidence**

In his defense, Doria introduced portions of four interviews of Nunes which were played for the jury.

In the November 28, 2012 interview, Nunes said she knew that Hiter's killer was White because of the way he spoke.

In the December 9, 2011 interview, Nunes stated she previously thought the shooter was "Chaos," but that the shooter was not Chaos and that she was constantly second-guessing herself.

In her February 28, 2012 interview, she explained, "Chaos is just, ah, some guy that, um, I just thought that might have killed Jimmy, shot him." However, she clarified she did not personally know him, but he was reputed to be a "psycho." She denied Chaos was at the location of the crime, but mentioned his "distinctive voice."

In the May 9, 2012 interview Nunes, when asked again about Chaos, stated: "But—but that—that Chaos dude, I don't even know why I think he said—said Chaos, I really, I don't know why. I didn't—I really have no idea why I said that. I think that I heard one of my friends saying it, oh it was just Chaos or something like that. So that's why I—I think I said that." She reiterated she did not know Chaos, although she had spoken to him the year before.

The parties stipulated that "Chaos, otherwise known as Justin Winn, is approximately five-feet-six to five-foot-eight inches tall and approximately 145 to 165 pounds. [¶] It is further stipulated that there was no mention of Chaos in the first interview that occurred ... on November 29, 20[11] between Miss Nunes and Detective Johnson." The trial court refused Doria's request to offer evidence that Angela Law was with Chaos when she was apprehended by officers in February 2012, approximately three months after Hiter's murder.

**Costa's Defense Evidence**

Costa presented no evidence on her own behalf.

(People v. Martinez-Costa, slip op. at *2-5.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

//

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

//

---

4  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny

10

1   relief." <u>Richter</u>, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

2   have supported the state court's decision; and then it must ask whether it is possible fairminded

3   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

4   decision of [the Supreme] Court." <u>Id.</u> at 101.  The petitioner bears "the burden to demonstrate

5   that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d

6   925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

7          When it is clear, however, that a state court has not reached the merits of a petitioner's

8   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

9   habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

10  F.3d 1099, 1109 (9th Cir. 2006).

11  V.  <u>Petitioner's Claims</u>

12          A.  *Insufficiency of the Evidence*

13          Petitioner claims the evidence is insufficient to support a true finding that she acted with

14  reckless indifference to human life.  (ECF No. 1 at 5-6; ECF No. 15 at 10-20.)  Respondent

15  maintains the state appellate court reasonably rejected petitioner's claim; therefore, she is not

16  entitled to relief in these proceedings.  (ECF No. 13 at 20-26.)

17          The last reasoned rejection of petitioner's first claim is the decision of the California

18  Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

19  addressed this claim as follows:

20                    **The Special Circumstance Reckless Indifference Finding**

21              Costa argues there is insufficient evidence to support the jury's
22          special circumstance finding that Costa acted with reckless
            indifference to human life. Specifically, she argues something more
23          than being an aider and abettor in the underlying attempted robbery
            must be shown in order to affirm the jury's reckless indifference
24          finding. In denying Costa's motion for a new trial for lack of
            sufficient evidence, the trial court said: "[Defendant's attorney's]
25          argument that there is insubstantial evidence to support a special
            circumstance murder conviction does not, frankly, comport with the
26          evidence that the Court heard in this case. [¶] ... [¶]

27              "The jury clearly found beyond a reasonable doubt that there was
28          evidence to support the special circumstance murder, and I have to

11

agree from what I heard in this case, there was overwhelming evidence, really, that Ms. Martinez–Costa is the one who set up this robbery, and without Ms. Martinez–Costa, Mr. Hiter would be alive today. I have no doubt based on what I heard in this case."

"A defendant convicted of first degree murder with at least one special circumstance found true will be sentenced to either death or life imprisonment without the possibility of parole. (Pen. Code, § 190.2 ....) One of these special circumstances is the felony-murder special circumstance under which a murder occurred during the commission or attempted commission, or the immediate flight after commission, of one of eleven specified felonies. (§ 190.2, subd. (a)(17)(i-xi).) A felony-murder special circumstance is applicable to a defendant who is not the actual killer if the defendant, either with the 'intent to kill' (§ 190.2, subd. (c) ), or '*with reckless indifference to human life* and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of [one of the eleven enumerated felonies].' (§ 190.2, subd. (d) ....)" (*People v. Estrada* (1995) 11 Cal.4th 568, 571–572, original italics.)

As recognized by the California Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), special circumstances felony murder under section 190.2, subdivision (d) "imposes both a special acts reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks, supra*, at p. 798.)

To be a major participant, the "defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks, supra*, 61 Cal.4th at p. 802.) In assessing a defendant's role, the following factors may be utilized: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803.)

These factors are not necessarily determinative, but are meant to inform the court's decision. (See *Banks, supra*, 61 Cal.4th at p. 803 [noting "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]"].)

In assessing the mental requirement, the court "look[s] to whether a defendant has '"knowingly engag[ed] in criminal activities known to carry a grave risk of death."'" (*Banks, supra*, 61 Cal.4th at p. 801 [citing *People v. Estrada, supra*, 11 Cal.5th at p. 577; *Tison v. Arizona* (1987) 481 U.S. 137, 157 [95 L.Ed.2d 127, 144]].) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, at p. 801.) Notably, "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks, supra*, 61 Cal.4th at p. 808.) It is also not enough to be a major participant in a crime listed under section 189. (Id. at p. 810 ["[w]hether a category of crimes is sufficiently dangerous to warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries"].)

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court considered whether a defendant who planned an armed robbery had the requisite mental state for the reckless indifference to human life special circumstance of felony murder. (*Id.* at pp. 614–623.) Relying on the seminal Supreme Court of the United States decision, *Tison v. Arizona, supra*, 481 U.S. 137, it noted that whether a defendant has acted with reckless indifference has both an objective and subjective component. (*Clark, supra*, 63 Cal.4th at p. 617.) "The subjective element is the defendant's conscious disregard of risks known to him or her[,]" while the objective element asks "what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Ibid.*)

"When reviewing a challenge to the sufficiency of the evidence, we ask '"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' [Citations.]" (*Banks, supra*, 61 Cal.4th at p. 804, original italics.) "Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for '"substantial evidence—that is, evidence which is reasonable, credible, and of solid value"' that would support a finding beyond a reasonable doubt. [Citation.] These same standards apply to challenges to the evidence underlying a true finding on a special circumstance. [Citation.]" (*Ibid.*)

Whether substantial evidence supports a finding of reckless indifference to human life is a case specific inquiry for which there is no magic formula. Rather, we look at the totality of the circumstances to determine whether there is substantial evidence

13

Costa "'"knowingly engag[ed] in criminal activities known to carry a grave risk of death."'" (*Banks, supra*, 61 Cal.4th at p. 801; *In re Loza* (2017) 10 Cal.App.5th 38, 55 [the totality of the circumstances supported the reckless inference finding].)

Here, we hold substantial evidence supports the jury's determination that Costa acted with reckless indifference to human life.

The evidence showed that Costa lured Hiter—a drug dealer who she believed had sold her inferior methamphetamine—to her home in the dead of night to be robbed by Doria, another drug dealer, who she believed had the mentality of a child and was "fuckin' crazy." That Costa recruited Doria to rob Hiter suggests that she knew Doria was capable of violence. We note that, as a matter of common sense, taking money and drugs from a drug dealer is an inherently dangerous activity.

Here, the record shows both Doria and Hiter used and sold drugs and Costa knew that. Moreover, Doria was a dangerous person, who carried a gun at all times. He was known in his circle of acquaintances, of which Costa was one, to at least claim to have used a firearm to rob people, was known to have been previously involved in a shootout while robbing a dealer, and was known as a person considered capable of murder.

Costa's own son harbored concerns about Doria's violent tendencies and the danger he posed to Costa, which one can reasonably infer he expressed to his mother, further supporting Costa's subjective awareness of the risk incurred by enlisting Doria to rob Hiter.

Costa's awareness of the heightened potential for grave danger during the robbery may also be inferred from Costa texting her friend not come to Costa's house shortly before the botched robbery, arguably to keep the friend safe and avoid witnesses to the crime. That Hiter would not be a passive victim and was capable of defending himself from an armed assailant may be inferred from his apathy concerning a warning that Doria might try to rob him if he flashed money in front of him again. All of these factors notwithstanding, Costa arranged the robbery for her own purposes and participated in it knowing she was bringing together two violent drug dealers who were quite likely armed with firearms.

In light of all these facts and circumstances and the reasonable inferences that can be drawn therefrom, there is substantial evidence in the record to support the jury's ultimate finding that objectively the robbery Costa orchestrated posed a grave risk of death and that subjectively she was aware that her active participation, indeed her organization, of the robbery of Hiter, posed a grave risk of his death

14

1

2
and, therefore, that she acted with a reckless indifference to human life.

3
(People v. Martinez-Costa, slip op. at *11-13.)

4
Applicable Legal Standards

5
The law on sufficiency of the evidence is clearly established by the United States Supreme

6
Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

7
307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by

8
the record is "whether, after viewing the evidence in the light most favorable to the prosecution,

9
any rational trier of fact could have found the essential elements of the crime beyond a reasonable

10
doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus,

11
only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a

12
petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by

13
the elements defined by state law.  Id. at 324, n. 16.

14
If confronted by a record that supports conflicting inferences, a federal habeas court "must

15
presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

16
such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

17
Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

18
conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

19
After the enactment of the AEDPA, a federal habeas court must apply the standards of

20
Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

21
2005).  In applying the AEDPA's deferential standard of review, this court must presume the

22
correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

23
In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

24
explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

25

26

27

28
makes clear that it is the responsibility of the jury—not the court—
to decide what conclusions should be drawn from evidence admitted
at trial.  A reviewing court may set aside the jury's verdict on the
ground of insufficient evidence only if no rational trier of fact could
have agreed with the jury.  What is more, a federal court may not
overturn a state court decision rejecting a sufficiency of the evidence
challenge simply because the federal court disagrees with the state

15

> court.  The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

Section 190.2(a)(17) provides that "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under section 1904 to be true: … The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:  [¶] (A) Robbery in violation of Section 211 or 212.5."  Subdivision (d) of section 190.2 provides:

> Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4.

Relevant Background

Counsel for petitioner served a written motion for new trial on May 22, 2014.  (LD 1 at 34-43.)  The People filed a written opposition thereto.  (LD 1 at 29-33.)  On May 23, 2014, the trial court considered the motion:

> [DEFENSE COUNSEL] MR. SMITH:  I have a motion for new trial pending.
>
> THE COURT:  Mr. Smith filed a motion for new trial.  I believe it was yesterday or the day before.  The People have also responded to that motion.  They were able to respond to it yesterday, and I have reviewed the motion for new trial, as well as the opposition.
>
> Would you like to make any further arguments, Mr. Smith?

16

MR. SMITH:  I think anyone who reviews this case in its totality should be deeply disturbed.  This is a case in which the evidence pretty obviously shows that Mr. Doria pulled this thing off for his own purposes, following a plan of action that he has used before.

There's no - - no evidence that Ms. Martinez-Costa was gonna be cut in on any of the benefits for Mr. Doria's robbery, and there's no actual evidence that she knew in advance that there was going to be a robbery.

Two other females were involved, Angela Law, who went along and acted as a lookout, and Breaonna Nunes, who was surprisingly with Mr. Hiter when she showed up - - when he showed up on Bell Avenue, and who, instead of calling 9-1-1 at any time, fled with his car and his money and his dope.

Apparently the reason that Ms. Martinez-Costa was selected to be the person who was prosecuted in this case has nothing to do with the fact that she was the older of three.

I find the detective's assertion that he excused Ms. Nunes from any responsibility for this because he thought she was acting like a victim to be beyond ludicrous and unworthy of anything that would call itself a system of justice.

In any event, what we are left with is the evidence, and that evidence is based on some inferences drawn from rumors and speculation that "carabine" the thought that she had reached a conclusion that Ms. Martinez-Costa somehow had something to do with this because of a comment she allegedly made the preceding summer, expressing anger and frustration about the quality of some dope.

As has been pointed out, subsequent to that, Mr. Hiter bailed Ms. Martinez-Costa out of a financial jam, and there was no evidence that she had any murderous grudge against him that carried on after that.

The evidence is suspicion at most.  It's circumstantial, and what it lacks is any scintilla of concrete evidence showing that Ms. Martinez-Costa was in on a robbery plot.  Had there been a single text message saying something like well, you know, when do I get my cut, or how much do I get, are you gonna bring a gun, any - - anything like that, then I would have nothing to talk about, but there's [no] such evidence in this case.

And that leaves us in the position that's - - suspicion is not evidence.  This case is based on suspicion and it is not founded on solid substantial evidence that should be present to impose the kind of penalties that are at issue in this case.

Subsidiary to this is the Widget-stamping approach to the special circumstance allegation, which has been used, as it is so often, to just say that anybody who is - - has liability for an underlying felony, whether or not they were an active participant, whether or not they had a subjective awareness that the actual conduct in the case pos[]ed disregard for human life is just automatically sent down the tubes for

17

1  the extreme penalty just based on their aiding and abetting liability.

2  I think the special circumstance is intended to mean more than that.
   The facts of the Tyson and the Estrada cases suggest very directly
3  what that "something more" would consist of.

4  There's no evidence of a subjective intent to kill or a subjective
   disregard for human life because she wasn't physically a participant
5  in the events that led to Mr. Hiter's death.

6  I would ask that a new trial be granted.

7  THE COURT:  Ms. Park, would you like to be heard?

8  [PROSECUTOR] PARK:  To say that Ms. Cleo Costa was not a
   major participant in this case would be to ignore all the cell phone
9  evidence.

10  All of the cell phone evidence shows is that the only contact Mr. Hiter
    had was with Ms. Costa.  Immediately thereafter, after she has
11  contact either by text message or by telephone, she immediately
    contacts Mr. Doria.  We went over so many cell phone records that
12  went one right after the other.  The connection was with Ms. Costa
    and … Mr. Hiter.  Then Ms. Costa with Mr. Doria.
13
    To say that she didn't know that there was a robbery when Mr. Doria
14  and Ms. Law are casing his apartment is lacking any shred of
    common sense.  This occurs about 3:00 in the morning that she is,
15  quote, blowing up Mr. Hiter's phone to get him to the Bell Avenue
    address.
16
    There are so many prongs that I have already put in my motion that
17  Mr. Doria would not have known without Ms. Costa's knowledge,
    and I don't feel that she was simply an aider and abettor, she was the
18  major participant.  She's the one who set this entire - - all of the things
    that happened in motion.
19
    Had she not been part of this case, how would Mr. Doria even know
20  where Mr. Hiter lived?

21  How would Mr. Doria know when to come to the Bell Avenue
    address?
22
    She set this entire thing up.  She's the one who lured Mr. Hiter to that
23  address.

24  To say in - - quoting Mr. Smith, that she was a hapless woman who
    was drawn into Mr. Doria's robbery plot is very inconsistent with the
25  evidence that we heard.

26  She's the one who set this in motion.  She is the most - - in my view,
    the most culpable in this case.
27
    I agree that Mr. Doria is the one who actually pulled the trigger, but
28  had Mr. - - Ms. Costa not been involved in this case, we would never

18

1    be here.

2    So I very much disagree with Mr. Smith's assertion of the facts.

3    Ms. Bain's portion of this trial was very small.  I don't feel, as Mr. Smith put it in his motion, that she was the linchpin in this case.  I

4    very much disagree.

5    The cell phone evidence, her own statements, her lack of reaction when somebody she claims to have had a loving relationship with is

6    very telling. There's nothing about her crying or being upset. She, in fact, denies even knowing Mr. Hiter until she's called on it by the

7    detectives in this case.

8    She is a major participant. She was convicted based on her own words, the cell phone records and the testimony of Ms. Nunes and

9    Ms. Law.

10    And I would submit it on that.

11    MR. SMITH:  Counsel's argument makes my point regarding the special circumstance, which is that you need more.  Just being an

12    aider and abettor to a robbery means subjective awareness, participation in the actual conduct that causes death, and that's

13    what's missing in this case as far as the special circumstance goes.

14    THE COURT:  The Court has considered the arguments of counsel and the case law in this area.

15
     Mr. Smith's argument that there is insubstantial evidence to support
16    a special circumstance murder conviction does not, frankly, comport with the evidence that the Court heard in this case.

17    And your motion for new trial based on that is denied.

18
     The jury clearly found beyond a reasonable doubt that there was
19    evidence to support the special circumstance murder, and I have to agree from what I heard in this case, there was overwhelming

20    evidence, really, that Ms. Martinez-Costa is the one who set up this robbery, and without Ms. Martinez-Costa, Mr. Hiter would be alive

21    today.  I have no doubt based on what I heard in this case.

22    (LD 9 at 222-27.)

23                    Analysis

24         As stated by the state appellate court, in order to prove an aider and abettor guilty of the

25    felony murder special circumstance, "the prosecution must show that the aider and abettor had

26    intent to kill *or acted with reckless indifference to human life while acting as a major participant*

27    *in the underlying felony*."  § 190.2(c), (d) (italics added).  To be a major participant, the aider and

28    abettor must be a noticeable or conspicuous member, one of the larger or more important

                              19

1   members of a kind or group.  People v. Proby, 60 Cal.App.4th 922, 931 (1998).  To harbor

2   "reckless indifference to human life," the prosecution must show that the defendant has a

3   "subjective awareness of the grave risk to human life created by his or her participation in the

4   underlying felony."  People v. Estrada, 11 Cal.4th 568, 578 (1995); People v. Proby, at 928.

5          In this case, the state court reasonably determined that petitioner was a major participant.

6   The California Supreme Court has enumerated five factors relevant to determining whether an

7   individual is a major participant in a crime:  (1) what role the individual had in planning the

8   criminal plot that led to the death; (2) what role the individual had in supplying or using lethal

9   weapons; (3) the awareness the individual had of particular dangers posed by the nature of the

10  crime, weapons used, or past experience or conduct of the other participants; (4) whether the

11  individual was present at the scene of the killing, in a position to facilitate or prevent the actual

12  murder, and did his or her actions play a particular role in the death; and (5) what the individual

13  did after lethal force was used.  People v. Banks, 61 Cal.4th 788, 803 (2015).

14         Following a review of this record, it was not objectively unreasonable for the state

15  appellate court to find there was sufficient evidence to support the jury's finding that petitioner

16  was a major participant.  (See, e.g., LD 6 at 266-68 [Nunes' testimony concerning calls/texts to

17  victim], 276-78 [Nunes: woman present at scene], 282-85 [Nunes: petitioner woman at scene];

18  LD 7 at 55-57 [Nunes: petitioner present at scene], 89-94 [Law's testimony concerning Doria's

19  calls/texts with a woman], 104-06 [Law: petitioner's voice on calls with Doria], 75-78 [Law:

20  Doria known to carry gun, commit robbery], 133-36 [Law: Doria armed], 176-77 [Bain: does not

21  recall telling detectives victim carried a lot of cash], 178-80 [Bain: testified she did not remember

22  telling detective Doria robbed drug dealers, Doria's associates were armed & that Doria told her

23  he shot a dealer], 195 [Bain: does not recall petitioner informing her victim had a safe and

24  petitioner intended to take safe], 204-05 [Ballejos' testimony concerning text from petitioner to

25  stay away], 223 [Detective Johnson's testimony petitioner was present at scene, in home], 223-25

26  [Johnson: petitioner called 911 to report hit and run], 231-36 [Johnson: petitioner's cell used to

27  place 911 call], 264-74 [Johnson: cell phone records], 277-79 [Johnson: various texts involving

28  petitioner, victim, Doria, Ballejos], 304-08 [Johnson: additional text messages], 281-12 [Johnson:

1  testimony re cell phone tower pings for Nunes, victim, Law & Doria], 312-13 [Johnson:

2  petitioner's physical phone never found], 326 [Johnson: during interview, Law said she observed

3  Doria with gun]; LD 8 at 42-43 [Johnson: during interview, Law said she'd seen Doria with a

4  "tweaker type ski mask"][5], 67 [Detective McCoy's interview with Bain played], 78 [McCoy:

5  testimony concerning 911 call by petitioner], 79 & 119 [McCoy: asked petitioner to bring cell

6  with her to police department; she declined], 80-83 & 100 [McCoy: petitioner's phone not found],

7  102 [McCoy: petitioner provided inaccurate phone number], 109 & 135 [McCoy: Law

8  interviewed and said Doria advised petitioner set up crime], 151 [McCoy: in interview, Law said

9  Doria always armed], 152 [McCoy: Law's statements re conversation between Doria and

10  petitioner], 153 [McCoy: in interview, Law said Doria left ignition running, lights off, wearing

11  gloves, took off on bike, returned asking if she'd heard, didn't know if shot once or twice, gun

12  jammed], 158-65 & 171 [Collins' testimony re Bain's comments about knowing who murdered

13  victim, robbery gone bad], 181-86 [Officer Tennis: petitioner's statements to him at scene], 203

14  (McElroy admits she told detective she did not have phone number for Doria].)[6]

15         The state court also reasonably determined that petitioner acted with reckless indifference

16  to human life.  Reckless indifference to human life "encompasses a willingness to kill (or to assist

17  another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that

18  death as the outcome of his actions."  People v. Clark, 63 Cal. 4th 522, 617 (2016).  It requires a

19  subjective component, which is the individual's "conscious disregard of risks known to him or

20  her," and an objective component, which considers "what a law-abiding person would observe in

21  the actor's situation."  Id. (internal quotation marks & citations omitted).  Similar to the major

22  participant element, the California Supreme Court has enumerated five factors relevant to a

23  determination of whether an individual acted with reckless indifference to human life:  (1)

24  knowledge and use of weapons; (2) physical presence at the crime and opportunity to prevent the

25  crime or aid the victim; (3) duration of the crime; (4) knowledge of the likelihood of killing; and

26
_____

27  [5] See also ECF No. 16-3 at 62-66 (Detective Shrum: black ski mask located during search of
    Doria's home).

28  [6] See also ECF No. 16-3 at 23-24, 34-35.

1  (5) efforts to minimize the risks of the violence during the crime.  Id. at 618-23.

2      Following a review of the record, the state appellate court's finding that petitioner acted

3  with reckless indifference to human life was not objectively unreasonable.  (See, e.g., LD 6 at

4  266-68 [Nunes' testimony concerning calls/texts to victim], 276-78 [Nunes: woman present at

5  scene], 282-85 [Nunes: petitioner woman at scene]; LD 7 at 55-57 [Nunes: petitioner present at

6  scene], 223 [Detective Johnson's testimony petitioner was present at scene, in home], 223-25

7  [Johnson: petitioner called 911 to report hit and run], 231-36 [Johnson: petitioner's cell used to

8  place 911 call], 326 [Johnson: during interview, Law said she observed Doria with gun]; LD 8 at

9  78 [Detective McCoy's testimony concerning 911 call by petitioner], 151 [McCoy: in interview,

10  Law said Doria always armed], 181-86 [Officer Tennis: petitioner's statements to him at scene];

11  ECF No. 16-3 at 68 & 70 [Shrum: during search of petitioner's home, operational surveillance

12  camera connected to live feed monitor in southwest bedroom].)

13      "[I]t is the responsibility of the jury - not the [habeas] court - to decide what conclusions

14  should be drawn from evidence admitted at trial" (Cavazos, 565 U.S. at 2), and that the

15  undersigned "must presume—even if it does not affirmatively appear in the record—that the trier

16  of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

17  Jackson, 443 U.S. at 326; see also Cudjo v. Ayers, 698 F.3d 752, 763 (9th Cir. 2012) ("Supreme

18  Court precedent makes clear that questions of credibility are for the jury to decide").  From this

19  record, it is readily discerned the jury resolved any conflicts in testimony in favor of the

20  prosecution.

21      With specific regard to petitioner's argument that she did not fail to render aid to the

22  victim, that, rather, she called 911 and performed CPR, the undersigned notes the jury was free to

23  disbelieve petitioner's statements.  The jury may have believed petitioner's actions were merely

24  an attempt to distance herself and evade responsibility.  The record establishes petitioner's 911

25  call was played for the jury (LD 8 at 78) and it was for the jury to determine, in light of other

26  evidence – including, e.g., evidence from which it can be inferred petitioner delayed calling 911

27  //

28  //

1    (see LD 7 at 205-09, 279 [six-minute gap], 295; LD 8 at 173-78)[7] - whether petitioner rendered

2    aid to the victim.  Notably too, this record reflects the issue of petitioner's 911 call was a subject

3    of closing arguments.  (Cf. LD 9 at 173-74 [defense closing argument: petitioner "called 911 and

4    tried to give C.P.R." "Listen to the emotion in her voice.  That's no B.S. She's - - she's not, you

5    know, a trained actress.  And I don't think even Meryl Streep could have shown the same - - same

6    genuine emotion and the genuine horror that she showed when she was on the phone, saw what - -

7    what was happening, realized that it was Jimmy Hiter"] to 186 [rebuttal argument: "Mr. Smith

8    characterize[s] her call to 911 as emotional.  Listen to that call.  It's hardly emotional"] & 189-90

9    [rebuttal argument: "Miss Costa did call 911.  But think about it. She wanted to do it first.  But

10    her first concern was to try to get Mr. Hiter's body out of the road that's why she called 911, and

11    that's why she told the operator that it was a hit and run"].)

12          Given this court's need to afford the state court the additional layer of deference required

13    by Juan H., 408 F.3d at 1274, and also to presume the correctness of the state court's factual

14    findings under 28 U.S.C. § 2254(e)(1), the undersigned finds petitioner's contention that the

15    evidence of her reckless indifference was constitutionally deficient to be wholly unpersuasive.

16    Under Juan H., the AEDPA only requires that this court decide whether the Third District Court

17    of Appeal's decision was contrary to or an unreasonable application of clearly established federal

18    law, i.e., whether the adjudication of sufficient evidence under Jackson was objectively

19    unreasonable or whether "fairminded jurists" could disagree about the conclusion.  Wiggins v.

20    Smith, 539 U.S. at 511; Richter, 562 U.S. at 101.  It was not objectively unreasonable.  Nor did

21    the state court's adjudication involve an unreasonable application of the facts.  28 U.S.C.

22    § 2254(d).  For the reasons discussed above, the undersigned concludes that the state court's

23    adjudication was objectively reasonable.  Therefore, it is recommended petitioner's first claim be

24    denied.

25    //

26

27    ——————————————

[7] The jury also heard Nunes' testimony that petitioner asked her to help move the victim's body;
28    Nunes thought petitioner wanted to dispose of body.  (See LD 6 at 292-93, 301-02, 324; LD 7 at
33, 58-59.)

1          B. *Third Party Culpability Evidence*

2          Petitioner claims the trial court erroneously excluded third party culpability evidence in

3    violation of her constitutional rights to present a defense.  (ECF No. 1 at 8-9; ECF No. 15 at 20-

4    25.)  Respondent contends the claim is procedurally barred, and in any event, the state court's

5    rejection of the claim was reasonable.  (ECF No. 13 at 27-33.)

6          Initially, the undersigned addresses respondent's assertion of a procedural bar.  Generally,

7    "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the

8    state] court rests on a state law ground that is independent of the federal question and adequate to

9    support the judgment.'"  Walker v. Martin, 562 U.S. 307, 315 (2011) (quoting Beard v. Kindler,

10   558 U.S. 53, 55 (2009)).  However, a reviewing court need not invariably resolve the question of

11   procedural default prior to ruling on the merits of a claim.  Lambrix v. Singletary, 520 U.S. 518,

12   524-25 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural

13   bar issues are not infrequently more complex than the merits issues presented by the appeal, so it

14   may well make sense in some instances to proceed to the merits if the result will be the same");

15   Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of

16   procedural default should ordinarily be considered first, a reviewing court need not do so

17   invariably, especially when the issue turns on difficult questions of state law).  Where deciding

18   the merits of a claim proves to be less complicated and less time-consuming than adjudicating the

19   issue of procedural default, a court may exercise discretion in its management of the case to reject

20   the claim on the merits and forgo an analysis of procedural default.  Franklin, 290 F.3d at 1232

21   (citing Lambrix, 520 U.S. at 525).  In the interests of judicial economy, the undersigned elects to

22   forego an analysis of procedural default in favor of a merits analysis.

23         The last reasoned rejection of petitioner's claim is the decision of the California Court of

24   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

25   this claim as follows:

26   //

27   //

28

24

1

***Evidence of Third-Party Culpability***

2

3

Doria argues the trial court abused its discretion in excluding evidence that witness Angela Law "was linked to another potential suspect in the Hiter shooting" and that this exclusion violated his federal due process right to present a defense.

4

5

Costa attempts to join this challenge on appeal, but she has forfeited the issue because she did not preserve it in the trial court. Doria raised the issue twice in the trial court, but Costa's attorney failed to join Doria's argument and stated on the record, "I'm staying out of this," and that it was "their issue." (See *People v. Panah* (2005) 35 Cal.4th 395, 481 ["Since defendant did not seek admission of the testimony as third party culpability evidence, he forfeited any claim that it was improperly excluded for that purpose"].)

6

7

8

9

10

"'We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citations.]' [Citation.]

11

12

13

14

15

16

"In *People v. Hall* (1986) 41 Cal.3d 826 [*Hall*], we held that 'the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' (*Id.* at p. 833.) 'Our holding [in *Hall*] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra*, 41 Cal.3d at p. 833.) We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352. [Citation.]' (*People v. Edelbacher*[ (1989) ] 47 Cal.3d 983, 1017.)" (*People v. McWhorter* (2009) 47 Cal.4th 318, 367–368.)

17

18

19

20

21

22

23

24

25

A trial court's ruling on third party culpability evidence is reviewed for an abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242 (*Prince*).)

26

27

Here, as previously set forth, the trial court allowed the admission of

28

recorded statements of Nunes which, at least in part, suggested that she may have believed at one point that an individual known as Chaos killed Hiter. Doria complains the trial court should have gone further; that the trial court abused its discretion when it refused to also admit testimony that would link Chaos to Law because they were seen together some months after the murder.

The trial court excluded this testimony, noting, "There is really not [sic] other evidence that I can see in here in any significant way links [Chaos] to this case or to this crime. He hasn't been placed at the scene, near the scene. [¶] The most is that—the closest he can get to the case is that [Chaos] apparently knew one of the other people in this case, Miss Crystal—no, I'm sorry, Miss Law, whose name apparently was Crystal. [¶] That part I think is too tentative, and I have excluded that as being irrelevant just because months after the crime she was—when she was arrested, she was found in his presence. I don't think there is any probative aspect to that and I have excluded that under 352 ...."

The trial court did not abuse its discretion when it excluded the proffered testimony as irrelevant and as not sufficiently probative of third party culpability.

Whether Law may have been in the same place as Chaos when she was arrested by authorities months after the murder is not capable of raising a reasonable doubt as to Doria's guilt for Hiter's killing. As the trial court found, this proposed testimony was not probative. It was simply irrelevant. (*People v. Brady* (2010) 50 Cal.4th 547, 558 ["to be relevant, the evidence must link this third person to the actual commission of the crime"].)

Further, assuming some marginal relevancy, the trial court properly exercised its discretion in excluding it under Evidence Code section 352 and the rationale of *Hall* recognizing "we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*Hall, supra,* 41 Cal.3d at p. 833.) The remoteness of Law's association with Chaos and the import of that later association, without more—and Doria did not offer more—had the potential for simply confusing the issues and misleading the jury which potential far outweighed what little probative value the evidence may have had. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1183 [upholding exclusion of "'highly speculative'" expert testimony under Evid. Code, § 352]; *People v. Stitely* (2005) 35 Cal.4th 514, 549–550 [upholding exclusion of evidence that could lead to speculative inferences].)

Finally, as recognized by the California Supreme Court in *Hall* and *Prince*, the exclusion of third party evidence through application of

1
2
3
4

> the ordinary rules of evidence does not violate a defendant's constitutional right to present a defense. (*Prince, supra,* 40 Cal.4th at p. 1243; *Hall, supra,* 41 Cal.3d at pp. 834–835 [exclusion of third party culpability evidence under Evid. Code, § 352 does not violate federal due process].)

5   (People v. Martinez-Costa, slip op. at *5-7.)

6                     Applicable Legal Standards

7          Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in

8   the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

9   guarantees criminal defendants "a meaningful opportunity to present a complete defense" and the

10  right to present relevant evidence in their own defense.  Holmes v. South Carolina, 547 U.S. 319,

11  324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

12         However, the United States Supreme Court has not "squarely addressed" whether a state

13  court's exercise of discretion to exclude testimony violates a criminal defendant's right to present

14  relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009).  Nor has the Supreme

15  Court clearly established a "controlling legal standard" for evaluating discretionary decisions to

16  exclude the type of evidence at issue here.  Id. at 758.

17         Evidence of potential third-party culpability must be admitted when, under the "facts and

18  circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.

19  Thus, in Chambers v. Mississippi, 410 U.S. 284, 303 (1973), exclusion of evidence of a third-

20  party confession was found to violate due process where the excluded evidence was highly

21  corroborated, and the excluded testimony was crucial to the defense.  Likewise, in Lunbery v.

22  Hornbeak, 605 F.3d 754, 760-61 (9th Cir. 2010), the exclusion of a statement by a third-party that

23  he had killed defendant's husband deprived defendant of the right to present a defense because the

24  "excluded testimony ... bore substantial guarantees of trustworthiness and was critical to

25  [defendant's] defense."  Conversely, where the proffered evidence of third-party culpability

26  simply affords a possible ground of suspicion pointing to a third-party and does not directly

27  connect that person with the actual commission of the crime, that evidence may be properly

28  excluded.  People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry

1    v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).

2         "A defendant's right to present relevant evidence is not unlimited, but rather is subject to

3    reasonable restrictions," such as evidentiary and procedural rules.  United States v. Scheffer, 523

4    U.S. 303, 308 (1998).  In fact, "state and federal rulemakers have broad latitude under the

5    Constitution to establish rules excluding evidence from criminal trials," id., and the Supreme

6    Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to

7    exclude evidence if its probative value is outweighed by certain other factors such as unfair

8    prejudice, confusion of the issues, or potential to mislead the jury," Holmes v. South Carolina,

9    547 U.S. at 326.  Evidentiary rules do not violate a defendant's constitutional rights unless they

10   "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the

11   purposes they are designed to serve."  Id. at 324 (alteration in original) (internal quotation marks

12   omitted); see also Scheffer, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to

13   a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental

14   elements of the accused's defense").  In general, it has taken "unusually compelling

15   circumstances . . . to outweigh the strong state interest in administration of its trials."  Perry v.

16   Rushen, 713 F.2d at 1452.

17                          Relevant Background

18         The trial court first considered the prosecution's motion in limine concerning third party

19   culpability evidence on April 2, 2014.  (LD 6 at 44; see also LD 1 at 243-66.)  Specifically, as to

20   Jason Winn, aka Chaos,[8] the court heard argument from the parties and ultimately determined

21   Nunes' statements concerning Chaos being the shooter based on "a white voice, whatever that is,

22   and had a higher pitched voice than the detective," were "far too speculative."  (LD 6 at 64-76.)

23   The issue arose again on April 8, 2014, following selection and swearing in of the jury and

24   alternates (LD 6 at 200-03):

25

26   _____

27   [8] Doria's defense counsel also initially sought to proffer third party culpability evidence in the
     form of an admission by "Mr. Silva" and a possible admission by "Insanity," an individual whom
     counsel had thus far been unable to identify or locate.  No further references to these individuals

28   as culpable third parties appear in the record.

                                    28

1    [CO-DEFENDANT'S COUNSEL] MR. ORTIZ:  Judge, I think the
     issue is regarding the voice of the shooter.

2
     As I argued in limine, our -- - one of our defenses is that it's maybe
3    this Chaos person who was responsible for the shooting.

4    At one point Miss Nunes thought it could be him or might be him.
     He fits the description of what Miss Nunes said that the person
5    physically was like, tall, skinny, white.

6    THE COURT:  But there is some ambiguity in the statement that
     she's given - -
7
     MR. ORTIZ:  Correct.
8
     THE COURT:  - - as to whether or not she can say that voice was - -
9    whether she's saying that voice was Chaos or that voice just was
     similar to his - - shared some qualities.
10
     MR. ORTIZ:  Right.
11
     THE COURT:  In other words, it was a distinctive voice but we don't
12   know what she meant by that.

13   MR. ORTIZ:  Right.

14   And I would like some leeway, at leas[t] initially, as to why she said
     Chaos in the first place.
15
     The reason is - - is this.  When you read through the transcript and
16   you watch the interviews, my review of the first interview, there is
     no mention of a - - a Chaos.
17
     In the second interview, that's when she raises the question of oh, for
18   the first time based on my review of the transcripts and watching the
     interviews.  But the way she brings it up is I told you about Chaos.
19   Now, I'm second-guessing myself.

20   I don't find that anywhere in the prior statements where she told them
     that - - that it was Chaos.  I don't know if it happened outside the
21   interview room with the officers or what.  So I would like to be able
     to ask her about that.
22
     THE COURT:  Okay. And can someone remind me again?  What is
23   this person named Chaos, what is his relationship to other people in
     this case?  What's his - - what's his - - do we know his actual name
24   or - -

25   MR. ORTIZ:  Yeah.  Justin.  I have it in my - - Justin Winn.

26   THE COURT:  Winn, W-i-n-n.  Winn?

27   MR. ORTIZ:  Correct.

28   THE COURT:  Okay.  And he's related to someone in this case as a

1    friend or as a boyfriend.

2    MR. ORTIZ:  They all know each other.  As you will see during the
     - - through the trial, all these people are connected and - - and she's
3    met him a couple times. She's given statements as to when she met
     him and how many times but - -
4
     THE COURT:  Okay.
5
     MR. ORTIZ:  That he's just part of this group.
6
     THE COURT:  Miss Park, is it your understanding that Mr. Ortiz is
7    calling this witness direct exam or did you want to call this witness
     to begin direct?
8
     [PROSECUTOR]:  I would like - - like to call the witness, your
9    Honor.

10   THE COURT: Is she here?

11   [PROSECUTOR]:  Yes.

12   (LD 6 at 203-06.)  Breonna Nunes then testified during a California Evidence Code section 402

13   hearing.  (LD 6 at 207-23.)  Specifically, during direct examination regarding her comments to

14   detectives about Chaos, Nunes testified that during her first interview with detectives she

15   indicated she "heard the shooter's voice" (LD 6 at 207); during a subsequent interview she recalls

16   "the name Chaos" arose (LD 6 at 208).  Nunes testified she had met Chaos "a few times" (LD 6 at

17   208), perhaps only once prior to the victim's death (LD 6 at 209), that he was not a close friend

18   (id.), that she'd heard people talk about him (id.); people told her Chaos "just doesn't care.  That

19   he's just crazy like off the hook, you know, um, yeah."  (Id.)  Nunes acknowledged telling

20   Detective Johnson that Chaos may have been the shooter; asked why, Nunes replied, "Because

21   that's just what I was hearing."  (LD 6 at 209-10.)  She continued, "Yeah.  And then I was just

22   assuming I guess, maybe believing what I was hearing but --."  (LD 6 at 210.)  Nunes "threw out

23   the name Chaos" as a combination of what people had told her and assumptions she herself made.

24   (Id.)  She acknowledged that she eventually told the detective she did not even know why she

25   "threw out the name Chaos."  (Id.)

26   During cross-examination, Nunes admitted telling detectives that she was "second-

27   guessing" herself regarding Chaos.  (LD 6 at 212-13.)  During testimony regarding the shooter's

28   description, Nunes testified that she "assumed that the shooter was white because more of his

30

voice" and acknowledged telling the detectives she knew the shooter was white "'cuz of his mouth through the mask" and his voice, that "his voice wasn't ghetto." (LD 6 at 215-16.)  Nunes recalled saying Chaos had a "[h]igh pitch" voice, and "really distinctive." (LD 6 at 216.)  When asked "that's one of the reasons why you thought it was Chaos, right, because of this voice that you recognized? [¶] Isn't that right, what you thought at the time at least," Nunes replied, "Not necessarily." (LD 6 at 216.)  Asked again, Nunes testified, "The voice, yes."  When asked if the shooter's voice "sounded like Chaos's voice," Nunes stated, "Everyone, maybe Chaos, not - - I guess, yes." (LD 6 at 217.)  Nunes indicated she had seen Chaos in the company of a "girl" once since the shooting. (LD 6 at 217-18.)  The trial court clarified with the witness that she had spoken with Chaos once prior to the shooting; she had heard him speak "a few times, just like over the phone and stuff like that, around people." (LD 2 at 218.)  Nunes thought she could recognize his voice. (Id.)  When asked by the trial court whether in Nunes's opinion the voice she heard the night of the shooting was Chaos, she replied "No" and "No, I don't - - I don't think, no." (LD 6 at 219.)  Asked what she could say today about the shooter's voice, Nunes stated she "believe[d] it was a white guy" "'cuz it didn't - - like I said it didn't sound like ghetto or anything like that you know." (Id.)  Asked again by the trial court whether she recognized "the voice of the shooter," Nunes replied, "Today, no.  No.  I - - I - - I - - I don't." (Id.)

The parties continued argument to the court following Nunes's testimony (LD 6 at 223-28.)  The trial court then ruled as follows:

> THE COURT:  All right.  I am gonna exclude any questioning of her about Chaos because there are multiple statements she's given.
>
> It does sound to me like ultimately it is so ambiguous is the problem what she said, even - - even if she did.  I'm gonna assume for a minute that she told a detective somewhere or some officer that she thought it was Chaos.
>
> It must - - based on the statement, December 9th, it sounds like she's referencing something.  And maybe it was a - - while they're walking to the interview room and so it's not tape-recorded.  I don't know.
>
> But somewhere in there if she's thinking it's him, it sounds like because there has been talk or maybe it's because Chaos is just such a crazy guy that maybe it aroused her suspicion and he's connected to this group somehow.

1
2
3
4
5

But - - but let's assume for a moment she says that.  If she's - - if she then excludes it and says it's not and gives some reasons why it isn't, and then later in February talks about it again, February of 2012, talks about it again, and clearly you impeached her with this distinctive voice thing, which is something she is not recalling now as - - as being something that was very distinctive, I still - - I'm trying to take those interviews in - - into - - in - - into account with what she's saying here today which is really that she didn't have a very good baseline for even discussing or identifying a voice.

6
7

I mean, she's spoken to him only maybe one other time and has heard him speak in front of other people a few times.  She doesn't recall his voice as being particularly distinctive at - - today.

8
9
10

I don't have any other - - you don't have any other evidence at - - evidence at moment (sic) anyway that I take it that he has a distinctive voice. And distinctive obviously is a relative term.  And she is identifying the shooter's voice as - - as being white, whatever that means.

11
12

But it sounds like really what that means is she's only excluding African Americans and maybe people with a heavy accent of some kind.

13
14
15

So when I take all that together, it just - - it sounds like ultimately if that goes in front of the []jury, that it is - - it's ambiguous, it's confusing.  And unless you can tie this up in another way, it is irrelevant.  And it seems to me and that's why I'm gonna exclude it [number] one because it's not relevant.

16
17
18

And two, because even if there was some relevancy at this time, it seems that it is - - it is going to be confusing I think to the jury.  It is somewhat of a chasing something down a rabbit hole at the moment because there's nothing to tie it up for you.

19
20

And so I'm gonna - - and because it is really third-party culpability that - - you know, that that is the issue.  And it has to be - - there has to be some real substantial evidence of it.

21
22

And at this point you don't have it.  And so that - - that is the main relevancy for which you introduced this to show that maybe it is Chaos was the actual shooter.

23
24

And if this is the only evidence that you have, and it sounds like that's all you have at the moment, I don't think it's sufficiently relevant or probative to put in front of the jury.

25
26

And I think it is - - can be prejudicial obviously to the People's case because there is no other evidence out there about this Chaos at the moment.

27
28

And so until you can or unless you can present some other information or put some other information together that would point the finger at Mr. Chaos, I am gonna exclude it at this time.

32

1    I am not precluding it for all time.  If you can - - I think it's - - we
2    can revisit this issue is all I'm going to say.  I am not promising that
     you can get it in.  We can revisit this issue if you find some other
3    evidence, if you find Mr. Chaos as to the shooter.

4    MR. ORTIZ:  Okay.  I just want to clarify what my argument was.

5    THE COURT:  Okay.

6    MR. ORTIZ:   My argument is you look at the two ends of the
     spectrum.  We have the initial statement by Miss Nunes where she
7    says either it's Chaos or I think it's Chaos.

8    And then we fast-forward to February when she's explaining why
     that very first time she said it was Chaos, because she's saying his
9    voice is very distinctive and that's why I said his name.

10   And then in between there, in between those two dates, she has
     several interviews and she's back-tracking.  And she's saying she
11   doesn't know why and doesn't know why she's saying his name.

12   But I think all that is of an effort to protect herself.  I - - I think that's
     for this jury to decide.

13   All I care about is why she made that first statement.  Is if what she
14   is saying I made that first statement because his voice is very
     distinctive and that's why I said his name, which is my reading of the
15   transcript, that's what I want in.  Everything else can be used to
     explain it away.

16   I see this no different really than the argument we had on similar
17   issue regarding Miss Bain.  She is saying - - and I know she is more
     specific there.

18   But part of the problem is, you know, our argument was, you know,
     she - - and she told us this from her own mouth, this is all rumors and
19   hearing from other people.  I never heard any of these things being
     said.  And - - and now that's being used against us in regard to Miss
20   Nunes.

21   THE COURT:  The difference is Miss Bain was unequivocal in her
     statement to the detectives and then is going to be - - and she's now
22   saying she either did not say that flat-out or she lied about it when -
     - when she did say it because she was drug addled, a-d-d-l-e-d, which
23   is very different than what - - what Miss Nunes is testifying to.

24   She's saying she was ambiguous at the time she was saying it.
     Sounds like the detective never did really nail her down and say are
25   you saying this is Chaos?  And that would have been good if
     somebody would have said that and that would have clarified that
26   issue.

27   But it sounds like at least from what you've read back to me, both of
     the is - - Miss Park and you both have given me bits and pieces of
28   that transcript.

                                      33

It sounds like there are hints at it. There are references to it. And then no one ever says to me are you telling me that you recognize this voice and that the shooter was actually Chaos and you know that because he has such a distinctive voice? And her answer being yes, that is what I'm saying. If someone would have done that, we would not be in this position.

But sounds like there was just - - it was just so ambiguous, like maybe it was and she's referring to one of the other people are saying, and so it's all very ambiguous.

And so it is different I think than - - than Miss Bain's situation. It's not just direct impeachment of something, and you wanted it some for something that is different. You wanted - - you wanted it in to show that Chaos is the shooter or could possibly be the shooter.

And - - and yet it's so ambiguous that that's not really what she said clearly, and so it's not just direct impeachment of that.

So unless you have something more substantial, I think under third-party liability law, which is what I think you need, I think you need something more than - - than an ambiguous statement that Chaos has a distinctive voice, and that's why I was thinking it might be him based on what I heard.

Anyway, I think we - - I think you know what I'm saying. I understand what you're saying. I understand what your argument is, and I think we've made a record of it.

(LD 6 at 228-33.)

During trial, Doria's counsel asked the trial court to reconsider its earlier ruling. (LD 16-3 at 73.) The court heard argument from counsel (LD 16-3 at 74-88 [Nunes's statements and Law being found in Chaos' presence months after murder]) and ruled Nunes's statements about Chaos could not come in for purposes of third-party culpability. (LD 16-3 at 88; see also LD 16-4 at 4-14.)

Analysis

The Third District Court of Appeal's denial of petitioner's claim was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent.

First, the undersigned finds the decision - that the trial court did not violate petitioner's federal constitutional rights by excluding proffered evidence of third-party culpability - is not contrary to or an unreasonable application of clearly established federal law because the Supreme Court has not squarely established precedent on the issue. See Knowles v. Mirzayance, 556 U.S.

34

1   111, 122 (2009) ("it is not an unreasonable application of 'clearly established Federal law' for a

2   state court to decline to apply a specific legal rule that has not been squarely established by [the

3   United States Supreme Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is

4   "unauthorized" under § 2254(d)(1) when the Supreme Court's decisions "give no clear answer to

5   the question presented, let alone one in [the petitioner's] favor," because the state court cannot be

6   said to have unreasonably applied clearly established federal law); Moses v. Payne, 555 F.3d at

7   758-59; Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of *Moses* and

8   the present, the Supreme Court has not decided any case either 'squarely address[ing]' the

9   discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing]

10   a controlling legal standard' for evaluating such exclusions").

11       Even setting aside the issue of clearly established federal law, however, relief is

12   unwarranted.

13       Although the exclusion of trustworthy and necessary exculpatory evidence violates due

14   process, the proffered evidence here was nothing more than speculation; there was no other direct

15   or circumstantial evidence linking Justin Winn aka Chaos to the victim's murder.  As referenced

16   above, this record establishes the evidence proffered by petitioner in support of her third-party

17   culpability claim was speculative and lacking any link to the victim's murder over and above that

18   speculation and, therefore, not relevant.  People of Territory of Guam v. Ignacio, 10 F.3d at 615;

19   United States v. Rubio-Topete, 999 F.2d 1334, 1339-40 (9th Cir. 1993) (defendant not deprived

20   of due process right to present a defense when excluded evidence "was marginally relevant, at

21   best," and would have added little, if anything, to defendant's defense).  The proffered evidence

22   may have been crucial to the defense in the sense identity of the murderer was key, but the

23   proffers were in no way highly corroborated.  Chambers v. Mississippi, 410 U.S. at 303.

24       Other than Nunes's ambiguous reference to Chaos, there is no other evidence tying Chaos

25   to the victim's murder.  Nor did Law being Chaos' presence months after the murder connect

26   Chaos to Hiter's murder.  Holmes v. South Carolina, 547 U.S. at 327 (exclusion appropriate

27   where third-party culpability evidence does not sufficiently connect the other person to the

28   crime); United States v. Vallejo, 237 F.3d 1008, 1023 (9th Cir. 2001) (holding that third party

1    culpability evidence is only admissible if it tends to prove that a person other than the defendant

2    committed the charged crime); Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) ("there must

3    be direct or circumstantial evidence linking the third person to the actual perpetration of the

4    crime").  Here, there is simply no connection or link tying Chaos to this crime, nor does the

5    proffered third-party culpability evidence tend to prove a person other than petitioner and Doria

6    committed the murder.

7         The decision of the California Court of Appeal is not "so lacking in justification that there

8    was an error well understood and comprehended in existing law beyond any possibility for

9    fairminded disagreement." Richter, 562 U.S. at 103.  Under the circumstances of this case,

10    petitioner has not met her "heavy" burden to show a due process violation resulting from the trial

11    court's decision to exclude the alleged third-party culpability evidence.

12         Assuming arguendo that the trial court's exclusion of this evidence was constitutional

13    error, the error could not have had a "substantial and injurious effect or influence in determining

14    the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

15         There was significant evidence linking Doria and petitioner to this crime.  For example,

16    cell phone records evidence that Doria and Law were present at the victim's apartment complex

17    when the victim and Nunes drove off in his vehicle prior to his murder.  (LD 7 at 264-74, 277-79,

18    288-97, 309.)  Those same records place Doria and Law near petitioner's home just prior to the

19    murder.  (LD 7 at 309-11.)  Law testified she was with Doria and that Doria asked her to knock

20    on the victim's door to be sure no one was home.  (LD 7 at 80-84, 86-88, 124.)  Law heard

21    Doria's side of a conversation Doria had with a woman concerning the victim's whereabouts; she

22    recognized the voice as belonging to petitioner.  (LD 7 at 89-94, 104-06.)  Further, Law testified

23    that Doria parked near petitioner's home, left the vehicle running with its lights off, took a bike

24    out of the back of the vehicle and then rode off in the direction of petitioner's home.  (LD 7 at 95-

25    99, 132.)   Minutes later, Law testified, she heard a gun, and then Doria returned stating the gun

26    jammed; he seemed anxious, and asked whether she'd heard a gunshot.  (LD 7 at 101, 113.)

27    Nearby, at about 3:38 a.m., petitioner's neighbor Gina Ballejos heard a gunshot and called

28    petitioner.  (LD 7 at 205-06, 211, 279; LD 8 at 174-76.)  Petitioner texted Ballejos "don't come

1    over" at about this time.  (LD 7 at 278.)  Petitioner made a 911 call at 3:46 a.m. reporting a hit

2    and run.  (LD 7 at 278, 295; LD 8 at 78.)

3          Other than Nunes's equivocal statements about Chaos and Law being found in Chaos'

4    presence months after the murder, there is no evidence linking or connecting Chaos to the

5    victim's murder.  There is, however, significant documentary and testimonial evidence linking

6    petitioner and Doria to the murder.  The trial court's exclusion of the proffered third-party

7    culpability evidence, even were it error, would not have had a substantial and injurious effect or

8    influence on the jury's verdict.  Brecht, 507 U.S. at 623.

9          In sum, the state court's decision was not contrary to, or an unreasonable application of,

10   clearly established Supreme Court authority.  28 U.S.C. § 2254(d).  Thus, the undersigned

11   recommends this claim be denied.

12         C.  *Ineffective Assistance of Counsel*

13         Next, petitioner argues her constitutional rights to the effective assistance of counsel were

14   violated on various bases.  (ECF No. 1 at 10-14; ECF No. 15 at 25-40.)  Respondent counters the

15   state court reasonably denied petitioner's various ineffective assistance of counsel claims, barring

16   relief in these proceedings.  (ECF No. 13 at 33-44.)

17         Petitioner presented her ineffective assistance of counsel claims in a petition for writ of

18   habeas corpus filed with the Sacramento County Superior Court; that court denied the claims in a

19   reasoned decision.  (LD 21.)  Those same claims were also made in petitions for writ of habeas

20   corpus to the Third District Court of Appeal (LD 22) and California Supreme Court (LD 24); both

21   courts denied the claims (LD 23 & 25).

22                    Applicable Legal Standards

23         To prevail on a claim of ineffective assistance of counsel, a petitioner must show that her

24   trial counsel's performance "fell below an objective standard of reasonableness" and that "there is

25   a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

26   would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

27         Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

28   failed to meet an objective standard of reasonableness.  Strickland, 466 U.S. at 687.  There is "a

1  'strong presumption' that counsel's representation was within the 'wide range' of reasonable

2  professional assistance." <u>Richter,</u> 562 U.S. at 104 (quoting <u>Strickland,</u> 466 U.S. at 689).

3  Petitioner must rebut this presumption by demonstrating that her counsel's performance was

4  unreasonable under prevailing professional norms and was not the product of "sound trial

5  strategy." <u>Strickland,</u> 466 U.S. at 688-89.  Judicial scrutiny of defense counsel's performance is

6  "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

7  the time it occurred, without the benefit of hindsight.  <u>Id.</u> at 689.  "[S]trategic choices made after

8  thorough investigation of law and facts relevant to plausible options are virtually

9  unchallengeable." <u>Strickland,</u> 466 U.S. at 690.

10        The second prong of the <u>Strickland</u> test requires a petitioner to show that counsel's

11  conduct prejudiced her.  <u>Strickland,</u> 466 U.S. at 691-92.  Prejudice is found where "there is a

12  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

13  would have been different."  <u>Id.</u> at 694.  A reasonable probability is one "sufficient to undermine

14  confidence in the outcome."  <u>Id.</u> at 693.  "This does not require a showing that counsel's actions

15  'more likely than not altered the outcome,' but the difference between <u>Strickland's</u> prejudice

16  standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

17  <u>Richter,</u> 562 U.S. at 112 (quoting <u>Strickland,</u> 466 U.S. at 693).  "The likelihood of a different

18  result must be substantial, not just conceivable."  <u>Id.</u>

19                    Background and Analysis

20        Petitioner presented several bases upon which to present her claims of ineffective

21  assistance of counsel.  Each is addressed below.

22                    *Failure to File Discovery Motions*

23        First, petitioner complains trial counsel "failed to investigate and prepare for trial" and

24  "made no discovery motions."  She contends trial counsel filed only a motion for new trial.  (ECF

25  No. 1 at 11; ECF No. 15 at 28.)

26        The state superior court considered the claim and ruled as follows:

27            Petitioner first claims ineffective assistance of trial counsel, in failing
            to bring any discovery motion.

28

38

1
2
3
4
5

> Petitioner, however, fails to state with particularity what discovery in the prosecution's and law enforcement's possession had not been given to the defense team, let alone whether such material not disclosed to the defense would have been reasonably likely to have made a difference in the outcome of the trial. Nor does petitioner attach a copy of any such withheld material in support of the claim. As such, the claims fails and is denied (In re Swain (1949) 34 Cal.2d 300; In re Harris (1993) 5 Cal.4th 813, 827 fn. 5; Strickland v. Washington (1984) 466 U.S. 668).

6    (LD 21 at 2.)

7        The state superior court's decision is not unreasonable. Petitioner's claim is in fact

8    conclusory and speculative. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994) (the claim is

9    conclusory and unsupported and should be rejected as such); Villafuerte v. Stewart, 111 F.3d 616,

10   632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no

11   evidence concerning what counsel would have found had he investigated further, or what

12   lengthier preparation would have accomplished). Petitioner failed to identify what particular

13   motion for discovery should have been made on her behalf let alone establish she would have

14   prevailed on the motion. See Kimmelman v. Morrison, 477 U.S. 365, 382 (1986) (to prevail

15   under Strickland, petitioner must establish that foregone motion would have been meritorious).

16   Notably too, the undersigned's review of the record indicates counsel for co-defendant Doria did

17   not file any motion for discovery. (LD 1.) Further, there is a reference in the record that prior to

18   jury trial commencing, the matter was briefly delayed to allow petitioner's counsel to "follow-up"

19   on "some developing discovery." (LD 6 at 34.) Petitioner's counsel noted his follow up would

20   include whether it "would create an obligation on my part to find a witness and deal with an

21   unresolved issue, but hopefully the issue will be resolved." (LD 6 at 35.) During the subsequent

22   court proceedings, the prosecution advised the court both defense counsel had been provided with

23   a witness statement, and petitioner's counsel expressly indicated he would not be seeking a

24   continuance following its receipt. (LD 6 at 39-40.) Notably too, at the previous court

25   appearance, counsel for petitioner stated on the record that he did not seek a second jury, as co-

26   defendant Doria's counsel was considering, in light of petitioner's statement to law enforcement.

27   (LD 6 at 37-38.) These actions infer tactical decision making on the part of petitioner's counsel.

28   See Strickland, 466 U.S. at 687-90 (reasonable tactical decisions, including decisions with regard

1    to the presentation of the case, are "virtually unchallengeable").

2          The state court's decision was not contrary to, or an unreasonable application of, clearly

3    established Supreme Court authority.  28 U.S.C. § 2254(d).  Thus, the undersigned recommends

4    this sub-claim of ground three be denied.

5                    *Failure to Oppose People's Motion in Limine re Prior Conduct*

6          Next, petitioner complains trial counsel was ineffective for failing to oppose the

7    prosecution's motion in limine concerning "prior conduct."  (ECF No. 1 at 11.)

8          As to this claim, the state superior court ruled:

9          Petitioner also claims ineffective assistance of trial counsel, in failing
10         to oppose the prosecution's motion in limine to admit petitioner's
           prior conduct into evidence.

11         In support, petitioner has attached as Exhibit B the prosecution's
           written motions in limine, which included a motion to be allowed to
12         introduce petitioner's prior convictions of crimes involving moral
           turpitude should petitioner testify.  Petitioner, however, fails to attach
13         reporter's transcript of the trial showing the colloquy that ensued on
           this matter.  Indeed, the court's yellow sheet minute orders for the
14         trial, contained in the court's underlying file for Case No. 12F00180,
           show that on April 15, 2014, "[o]utside the presence of the jury the
15         Court and counsel discussed with moral turpitude crimes would be
           brought into evidence if either defendant chooses to testify."  Nor
16         does petitioner set forth what argument petitioner's counsel should
           have made, that was not made at the time, that would have been
17         reasonably likely to have resulted in the court excluding petitioner's
           prior convictions, let alone that such a ruling would have been
18         reasonably likely to have made a difference in the trial, as petitioner
           chose not to testify.  As such, the claim fails and is denied (Swain;
19         Harris; Strickland).

20   (LD 21 at 2-3.)

21         The state superior court's ruling is not unreasonable.  This record reveals the People filed

22   their motions in limine on March 27, 2014 and April 2, 2014.  (LD 1 at 243-66, 287-93.)  Further,

23   a review of the record reveals that on April 2, 2014, the court addressed the prosecution's original

24   and supplemental motions in limine.  (LD 6 at 44, 48-119.)

25         With particular regard to the prosecutor's request regarding the ability to impeach

26   defendants with prior convictions involving moral turpitude if defendants were to testify, counsel

27   for both defendants indicated decisions had not yet been made.  Petitioner's counsel specifically

28   stated: "It can wait.  I can - - making no representation as to whether or not my client will testify

                                                    40

one way or the other.  We can resolve those issues if and when it becomes necessary;" co-defendant's counsel agreed, and the trial court determined it would "take that up at a later time if the defendants decide they would like to testify."  (LD 6 at 86-87.)  Counsel for petitioner did not oppose the issue concerning petitioner's prior convictions involving moral turpitude, asserting the issue was not ripe as no decision had been made with regard to whether petitioner would testify on her own behalf.  This tactic was not unreasonable.

Significantly, evidence concerning petitioner's prior conviction arose during the testimony of prosecution witness Cara Bain.  (LD 7 at 165-98.)  Following Bain's direct examination, petitioner's counsel cross-examined Bain; the following colloquy occurred:

> Q.  Now, during the time that you lived with Miss Costa, did you ever hear her say anything to the effect she wanted to rob Jimmy Hiter?
>
> A.  No.
>
> Q.  Did she ever complain about getting bad dope from him?
>
> A.  No.
>
> Q.  Of your own personal knowledge, did you ever see Cleo Costa do anything of a violent nature to anybody?
>
> A.  No.
>
> Q.  Did you ever hear her, you know, talk, you know, big talk about, you know, I'm going to kick his ass and that kind of - -
>
> A.  No.
>
> Q.  – kind of violent talk?
>
> A.  No.
>
> Q.  Would you characterize Miss Costa as a violent or a not (sic) violent person?
>
> A.  A nonviolent person.

(LD 7 at 189.)

//

//

//

1    Following that exchange, on redirect,[9] the prosecution asked Bain the following:

2    [PROSECUTOR]:  … One other thing that I want to ask you about,
     Mr. Smith asked you about whether or not you knew if Cleo
3    Martinez-Costa was a violent person.  [¶] Do you remember that?

4    A.  Yes.

5    Q.  Okay.  And you said no?

6    A.  No.  Yeah.

7    Q.  Have you heard that in 1993, that Miss Costa-Martinez actually
     shot - - fired a firearm and shot somebody in the stomach?
8
     A.  No.
9

10   (LD 7 at 195-96.)

11   A reference to the fact petitioner's counsel opened the door during cross-examination of

12   Bain, allowing for the prosecutor's reference to petitioner's prior conviction appears in the record

13   during a discussion outside the jury's presence concerning impeachment evidence against the

14   defendants.  When the trial court indicated petitioner's prior conviction for assault with a firearm

15   could be used if defendant were to testify, the following exchange occurred:

16   MR. SMITH:  Well, I would object to it.  It's 21 years old. And it's
     also factually, at least the elements, similar to what we're dealing
17   with so I ask that it be excluded or sanitized.

18   [PROSECUTOR]:  Your Honor, may I respond?

19   THE COURT:  Yes.

20   MS. PARK:  The reason why I put the remaining crimes in my
     motion is that on the remoteness issue the courts talk about if since
21   the time of the conviction the defendant had led a blameless life, than
     the remoteness issue kicks in.
22
     However, this particular defendant had ongoing crimes, that's why I
23   put that in there.

24   *Furthermore, as the Court recalls, during Cara Bain's testimony, it
     eventually came in.*
25
     THE COURT:  Right.  It came in for - - under character evidence.
26

27   ───────────────
     [9] The prosecutor requested a side bar immediately prior to redirect and the trial court
     acknowledged "a sidebar and conversation in chambers" prior to the commencement of the
28   redirect examination.  (LD 7 at 193.)

1

> When - - when she was presented as a person who didn't have a
> character for violence and then she was impeached or that witness
> was impeached with that, had you heard that she'd been convicted of
> this prior?

2

3

4

> MR. SMITH:  Which she answered in the negative.

5   (LD 16-3 at 97-98 (italics added).)  The record makes clear that the information about petitioner's

6   prior conviction was used for impeachment purposes during Bain's testimony, and that the trial

7   court would have permitted use of the information had petitioner elected to testify.  She did not.

8   Petitioner's counsel elicited testimony from Bain speaking to petitioner's character.  The

9   prosecutor was entitled to probe the issue further by asking Bain about the incident.

10        In any event, petitioner fails to explain what trial counsel should have argued to support

11   her assertion, nor does she show the motion would have been successful.  An attorney's failure to

12   make a meritless objection or motion does not constitute ineffective assistance of counsel.  See,

13   e.g., Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d

14   1341, 1344 (9th Cir. 1985)).  "'[F]airminded jurists could disagree' on the correctness of the state

15   court's decision" and, as a result, petitioner is not entitled to relief.  Richter, 562 U.S. at 101.  The

16   undersigned recommends petitioner's sub-claim of ground three be denied.

17                          *Failure to Support Third Party Culpability Evidence Efforts*

18        Next, petitioner complains trial counsel provided ineffective assistance by failing to

19   support co-defendant Doria's efforts to obtain additional testimony from Nunes regarding her

20   statements about Justin Winn aka Chaos when interviewed by detectives.  Petitioner asserts "the

21   third-party culpability defense was critical to showing that a different individual had been

22   identified" and that petitioner and Doria were not guilty.  (ECF No. 1 at 11-13.)

23        The state superior court considered the claim and ruled as follows:

24

> Petitioner also claims ineffective assistance of trial counsel, in failing
> to call witnesses or present evidence on petitioner's behalf at trial.
> Specifically, petitioner argues that there was a possibility that a
> person known as "Chaos" could have been established as having
> committed the crime, as witness Nunes had told police that she had
> later seen "Chaos" with Angela Law, who had said she had been with
> codefendant Doria at the time of the shooting and that it was "Chaos"
> who was the shooter, but that the court had excluded the statement
> under Evid. Code § 352.  She claims that this could have established

25

26

27

28

43

1    third-party culpability and that her defense counsel had waived the
2    issue at trial while codefendant Doria had alone sought admission of
     the evidence.

3    Only codefendant Doria raised the issue on appeal, of whether the
     trial court had abused its discretion in excluding the Angela Law
4    evidence that night have established third-party culpability.   Had
     petitioner also raised the issue in the trial court and on appeal,
5    however, petitioner would not have prevailed, as the Third District
     rejected Doria's claim on appeal.   The Third District noted that the
6    trial court had actually allowed the admission of the recorded
     statements of Nunes that had suggested in part that Nunes may have
7    believed at one point that "Chaos" had killed the victim, and that
     Doria had complained only that the trial court should have allowed
8    testimony that would linked "Chaos" to Law because they were seen
     together some months after the murder.   The Third District noted that
9    the trial court had excluded that part because it did not link "Chaos"
     to the crime, and held that this was not abuse of discretion.   The Third
10   District also held that even if it had had marginal relevancy, the
     exclusion had been proper under Evid. Code § 352.   As such, even if
11   petitioner had joined in Doria's motion at trial and in the claim on
     appeal, petitioner would not have prevailed.   Without a showing that
12   she would have prevailed petitioner cannot establish ineffective
     assistance of trial counsel on this claim (Strickland).
13
     Petitioner nevertheless claims that defense counsel should have
14   sought the introduction of the recording of jail telephone calls in
     which individuals other than petitioner and Doria were purportedly
15   identified as the perpetrators.   In support, petitioner attaches Exhibit
     I, which is a printout of the Sacramento Police Department's
16   narrative text hardcopy, of a sheriff's deputy's hearsay summary of
     what the deputy purported to hear during certain jail phone
17   recordings, and the deputy's quotations from those recordings.

18   A review of Exhibit I reveals that the deputy sheriff stated that on
     December 3, 2013, Deputy Lacey Nelson had told the reporting
19   deputy that on November 22, 2013 inmate Christia Saunders had told
     Nelson that Saunders had had a conversation with Nunes, and that
20   Nunes had stated that Nunes and another female were actually the
     ones who had set up the victim and killed him (page 11 of Exhibit I).
21   Nelson also told the reporting deputy that Saunders had stated that
     on November 14 or November 15 between 10 and 11 p.m., Saunders
22   made a phone call from the jail using inmate Janet Simpson's PIN
     and that during this case the "other apparent suspect" made
23   statements that verified that petitioner was not involved in the murder
     but that "they" were going to let petitioner "take the fall for it."
24   However, the content of that is not included in the deputy sheriff's
     summary of the calls the deputy sheriff had monitored that were
25   made on Simpson' PIN on November 14; no calls were listed in the
     report for November 13.   The deputy sheriff stated in the report that
26   the report showed all the conversations that the deputy sheriff could
     identify during a certain time period that included those days.
27
     The contents of Exhibit I contain multiple hearsay.   The gist of what
28   was disclosed does not show that the declarant had personal

44

1

2

3

4

5

6

7

8

9

> knowledge of whether petitioner had been involved in the murder. Nor does petitioner now attach any declaration under penalty of perjury from Christia Saunders that would set forth what testimony Saunders would have given at trial, had it been presented, that would have been reasonably likely to have made a difference in the outcome of the trial (Harris; Strickland).  In addition, the court's yellow sheet minutes orders for April 14, 2014 show that petitioner's counsel had intended to put Christia Saunders on the stand for the defense and that the clerk had scheduled Saunders to be transported for that purpose, but that on April 17, 2014, petitioner's counsel rested without presenting any witnesses, inferring that counsel had changed his mind about presenting Saunders as a likely tactical choice that could have been based on something counsel had been given in discovery.  As such, petitioner fails to set forth a prima facie case for relief on this claim, requiring its denial.  (In re Bower (1985) 38 Cal.3d 865).

10

(LD 21 at 3-5.)

11

The state court's determination is not unreasonable.  With regard to the third-party

12

culpability proffer by counsel for Doria as it concerns Nunes's statements about Chaos, the

13

undersigned has recommended petitioner's claim as asserted in ground two be denied.  See

14

discussion, *ante*.  In terms of trial counsel's assistance, petitioner's claim fails similarly.  The

15

state superior court's determination that even had petitioner's trial counsel supported and joined

16

in codefendant Doria's motion, the evidence would have been excluded for the reasons previously

17

addressed despite petitioner's assertions otherwise.  As more fully referenced in ground two, see

18

V.B., *ante*, petitioner cannot establish prejudice in the form of a reasonable probability of a

19

different result had the evidence been admitted; there was substantial evidence of petitioner and

20

codefendant Doria's guilt.  And evidence that Nunes observed Law after the murder in the

21

presence of Chaos and that Nunes brought up Chaos during interviews with detectives does not in

22

any way serve to exculpate petitioner.  That evidence in comparison to the other evidence

23

admitted at trial would have added nothing more than the conceivability of a different result,

24

rather than a reasonable probability of a different result.  Richter, 562 U.S. at 112.  Even

25

assuming trial counsel's actions were deficient, those actions did not prejudice petitioner.

26

Strickland, 466 U.S. at 691-694.

27

The same can be said of the state superior court's determination regarding Christia

28

Saunders, statements purportedly made by Nunes to Saunders and calls made by Saunders using

1  another inmate's PIN while confined in jail.

2        Trial counsel for petitioner initially sought the testimony of Christia Saunders and Janet

3  Simpson.  (LD 2 at 3; see also LD 21 at 134-36.)  Outside the presence of the jury, on April 14,

4  2014, petitioner's counsel addressed the trial court as follows:

5               [PETITIONER'S COUNSEL]:  Miss Park and I have been
             exchanging communications between potential witnesses in the

6               defense case.  In particular, the two jail inmates that I've already
             submitted paperwork.

7

8               And I am informed today that one of those two inmates, Janet
             Simpson, has a month worth of phone calls that were recorded out of

9               the jail that have not previously been discovered which Detective
             McCoy is now working diligently transcribing and copying and

10               they're going to discover them to me.

11               Neither Miss Park nor I have any idea what's in these cases - - calls,
             if there's any significance to them.  But it's something that I'm going

12               to have to deal with.

13               And until I have at least a chance to get into 'em, I have no idea if it
             means anything or what it means.  But I'm just letting the court know

14               that's out there.

15               THE COURT:  Okay.  And is that witness - - you were gonna call
             that witness possibly tomorrow or Wednesday?

16               MR. SMITH:  Well, I - - I mean, if there is - - if there is some

17               discovery, I have to - - I have to know that discovery because it
             pertains to that witness.

18               Frankly, I'm leaning heavily not - - toward not calling Janet Simpson

19               at least on anything other than a tangential issue.

20               I will be recalling Angela Law in the defense case.  And depending
             on her answers to some questions that I have for her, may put on

21               either Simpson or Christie Saunders, who is the other jail inmate who
             was made the phone calls.

22            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23               As I said, this is a month's worth of audiotapes with Janet Simpson.
             And I have to know what's in those tapes to know what, you know,

24               can of worms I might be opening by putting her on the stand so I
             have to deal with that.

25

26  (LD 8 at 90-91.)  Ultimately, petitioner's counsel called neither Simpson, Law nor Saunders to

27  the stand.  (LD 9 at 60 [defense rests without presenting testimony]; LD 2 at 20 [same].)

28  //

An attorney is not required to present trial testimony from every witness suggested by defendant.  United States v. Wadsworth, 830 F.2d 1500, 1509 (9th Cir. 1987) (trial tactics are clearly within the realm of powers committed to the discretion of defense counsel).  To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner.  See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  While petitioner did identify the witness (Saunders) and reference testimony the witness would have purportedly given (Nunes's statements to Saunders & Saunders' calls while incarcerated), and even assuming petitioner established availability and favorable testimony, petitioner did not demonstrate a reasonable probability that had the evidence been introduced the jury would have reached a more favorable verdict.

Further, a review of Exhibit I to petitioner's state habeas petition (LD 21 at 137-48) fully supports the state superior court's findings.  It can be reasonably inferred from both a review of the record and petitioner's exhibit that trial counsel reasonably concluded that presenting the testimony of Saunders or Simpson, or Law as it pertained to the substance of the recorded jail conversations, would indeed have opened the proverbial "can of worms."  Credibility would certainly be an issue for Saunders had she testified.  It can be inferred from this record that trial counsel elected not to call Saunders after having had a chance to investigate her claims and assess Saunders' credibility.  See Morris v. California, 966 F.2d 448, 456-57 (9th Cir. 1991), cert. denied, 506 U.S. 831 (1992) (where the record does not reveal counsel's actual reason for making a tactical decision, the Court need not determine counsel's actual reason so long as that decision falls within the range of reasonable representation).

//

//

//

In any event, fairminded jurists could disagree as to the findings of the state superior court as to petitioner's habeas claim.  And for that reason, petitioner is not entitled to relief in these proceedings.  Richter, 562 U.S. at 101.  Accordingly, the undersigned recommends this sub-claim of ground three be denied.

*Failure to Object*

Petitioner next complains that trial counsel provided ineffective assistance by failing to object or move for mistrial following a question posed to Bain by the prosecutor that elicited information concerning petitioner's prior conviction for assault with a firearm.  (ECF No. 1 at 13.)

The Sacramento County Superior Court ruling provides as follows:

> Petitioner also claims ineffective assistance of trial counsel, in that counsel failed to object to the prosecutor's misconduct in asking witness Bain, after Bain had been cross-examined by petitioner's counsel, whether Bain was aware that petitioner had shot a man in the stomach.  In support, petitioner attaches as Exhibit J a portion of trial transcript showing that the prosecutor had reminded the witness Bain upon further examination by the prosecutor that petitioner's counsel had asked whether or not Bain knew if petitioner was a violent person and that Bain had said no, then asked Bain if Bain had heard that in 1993 petitioner had actually fired a firearm and shot somebody in the stomach, to which Bain answered "no" (RT-467—RT-468).

> Petitioner fails to show that the prosecutor had committed misconduct, as trial counsel had obviously opened the door to allow the question when counsel had asked Bain if Bain knew if petitioner was a violent person.  As the prosecutor had not committed misconduct, trial counsel was not ineffective in failing to object to the question from the prosecutor.

> Regardless, in light of the overwhelming evidence of guilt as summarized by the Third District Court of Appeal in its opinion on the appeal of the matter, petitioner fails to show that had the prosecutor not posed the question to Bain it would have been reasonably likely that the outcome of the trial would have been different (Strickland v. Washington (1984) 466 U.S. 668).

(LD 21 at 5-6.)

The state court's determination is not unreasonable.  Trial counsel did not perform deficiently by failing to object to the prosecutor's question to Bain because the question was a valid one on redirect examination following petitioner's counsel's inquiries on cross.  (See V.B.,

48

1   *ante.*)  Counsel is not required to make a meritless objection.  <u>Jones v. Smith</u>, 231 F.3d at 1239

2   n.8 (citing <u>Boag v. Raines</u>, 769 F.2d at 1344).  Nor can petitioner establish that in the absence of

3   trial counsel's objection she was prejudiced.  The question was clearly proper and any objection

4   by trial counsel would have been overruled, meaning the jury would have learned the information

5   either way.

6        For the foregoing reasons, the undersigned recommends this sub-claim of ground three be

7   denied.

8                     *Failure to Offer Entire 911 Tape Recording into Evidence*

9        Next, petitioner contends trial counsel was ineffective for a failure to introduce the entire

10  911 recording into evidence, claiming an edited version offered by the prosecution removed

11  evidence "that could have completed negated the mens rea aspect as to" petitioner in the form of

12  petitioner performing CPR and inquiring into the ambulance's arrival.  (ECF No. 1 at 13.)

13       The state court's holding on the issue is as follows:

14          Petitioner also claims ineffective assistance of trial counsel, in that

15  counsel failed to seek to introduce the remaining portions of the 911
    tape that [s]he claims was partially played for the jury by the
    prosecution.  Petitioner alleges that the 911 tape had been edited to

16  delete the parts in which petitioner asked where the ambulate was
    and had stated that she was performing CPR on the victim.  She

17  claims that had the jury heard this evidence, it would have negated
    the mens rea component for petitioner. In support, petitioner attaches

18  Exhibit K, which appears to be a transcript of the entire text of the
    911 call, and which was marked as an exhibit from the People.

19

20          Petitioner fails to specifically identify which parts of the 911 call
    were actually edited out, nor does [s]he attach any reasonably

21  available documentary evidence to support [her] assertion that the
    tape was played and that it had in fact been edited.

22          Regardless, upon review of the transcript as well as review of the

23  Third District's summary of the trial evidence contained in the
    opinion on appeal, it appears that even if such had occurred it was

24  harmless error.  Witness Nunes had testified at trial that immediately
    after the shot was fired, Nunes got out of the car and saw the victim

25  on the ground in front of it and that the victim had been shot in his
    lower abdomen.  Nunes then immediately saw petitioner, and heard
    petitioner angrily say something like "where did that little bitch go";

26  petitioner then asked Nunes to help petitioner move the body and
    Nunes refused.  Witness Ballejos, petitioner's next door neighbor,

27  testified that [she] heard the gunshot, then called petitioner at 3:38
    a.m., meaning that the gunshot had occurred just before 3:38 a.m.

28  Petitioner called 911 six minutes later, at 3:44 a.m.  Petitioner would

have heard the gunshot, but told the 911 operator that she had heard a commotion outside that was a noise "like a shot or somethin'" but then, when switched to the fire department, changed her story to that she thought the girl who was driving a car hit the person with her car. She was asked if there were any obvious injuries and she replied that she didn't see anything and that that was why she was saying that she thought he got hit by a car or something.  In light of the additional evidence of planning on petitioner's part, the jury most likely surmised that she was lying on the 911 tape, and that if the jury had heard the parts that she now claims were not played the jury either would not have believed it or most likely would have thought that if she were in fact attempting CPR on the victim it was all for show, knowing that the paramedics would be there as quickly as possible. As such, the claim fails and is denied (Swain; Harris; Strickland).

(LD 21 at 6-7.)

The 911 call was played for the jury; by agreement of the parties that portion was not transcribed by the court reporter.  (LD 8 at 78 [during McCoy's testimony]; see also LD 2 at 2.) A transcript of the call appears in the record.  (LD 4 at 4-12.)  The transcript includes petitioner's inquiries to the dispatcher about the need for and arrival of an ambulance, as well as to petitioner's efforts to perform CPR.  (LD 4 at 8-12.)

The state court's determination was not unreasonable.

Notably, the undersigned's review of the record reveals nothing to indicate the 911 call and/or the transcript for that call was in any way edited or redacted.  In fact, the opposite is true. Significantly, a review of the record reveals reference to the 911 call and petitioner performing CPR during the People's opening statement.  (LD 6 at 241.)  In his opening statement, petitioner's trial counsel stated: "Cleo Costa … calls 911" and "She stayed on the phone with 911 and she administered - - tried to administer C.P.R. You'll hear a recording of all this as it happened."  (LD 6 at 255-256.)  Sacramento Police Officer John Tennis testified he was the first to respond to the call for service and took a statement from petitioner; he specifically noted petitioner's reference to having called 911 and to performing CPR until the fire department arrived.  (LD 8 at 179-85.) Additionally, during closing arguments to the jury, petitioner's counsel argued as follows:

She wasn't expecting what happened.  And that's why she at least initially didn't realize that it was a shooting.  Thought maybe it was a hit and run accident out there on the street, and went out there and called 911 and tried to give C.P.R. while she was on the phone.

50

(LD 9 at 173.)

There is nothing in this record to indicate the 911 call was edited or revised in any way. As a result, the state court's determination that trial counsel was not ineffective for failing to admit the entirety of the 911 call was not unreasonable.  The jury was plainly made aware of the fact petitioner attempted to perform CPR on the victim.

Even so, had the 911 recording been edited to delete references to petitioner's CPR efforts and her references to the immediate need for the ambulance to arrive, that evidence would not serve to negate mens rea.  The jury was presented with other evidence speaking to the issue.  For example, the jury was presented with evidence that there existed a delay between the time a gunshot was heard and petitioner making her call to 911.  (LD 7 at 206, 209, 277-79, 295; LD 8 at 68, 76-78, 176-77.)  The jury also learned that petitioner's phone – from which that 911 call was made – was never recovered despite petitioner having been specifically asked by law enforcement to bring that phone with her to the police department the morning of the incident. (LD 7 at 231; LD 8 at 79-83, 100, 102, 119.)

There is no indication in the record that counsel performed deficiently, nor is there is any indication of prejudice. Strickland, 466 U.S. at 687-94.

*Cumulative Effect*

To the degree petitioner claims trial counsel's purported failings amount to cumulative evidence of ineffective assistance of counsel (ECF No. 1 at 13), that sub-claim too should be denied.

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410 U.S. at 290). "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

51

influence' on the jury's verdict." <u>Parle</u>, 505 F.3d at 927 (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. at 637).

The undersigned has addressed each of petitioner's claims that trial counsel provided ineffective assistance of counsel and has concluded that no error of constitutional magnitude occurred. The undersigned also concludes that the alleged errors, even when considered together, did not render petitioner's defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." Accordingly, petitioner is not entitled to relief on her claim of cumulative error.

To conclude, the state court's decision concerning the various bases upon which petitioner asserted ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d). Thus, the undersigned recommends ground three be denied in its entirety.

D. *Prosecutorial Misconduct*

Finally, petitioner asserts the prosecutor committed misconduct when a question was posed to witness Bain that resulted in the jury learning of petitioner's prior conviction for assault with a firearm. (ECF No. 1 at 15-16; ECF No. 15 at 40-42.) Respondent maintains the state court's decision was reasonable and relief is barred. (ECF No. 13 at 44-46.)

Petitioner presented this claim to the Sacramento County Superior Court in a petition for writ of habeas corpus alleging a number of ineffective assistance of counsel claims. More specifically, petitioner alleged counsel was ineffective for failing "to object to the prosecutor's misconduct in asking witness Bain, after Bain had been cross-examined by petitioner's counsel, whether Bain was aware that petitioner had shot a man in the stomach." (LD 21.)

The undersigned has previously excepted the state court's findings as a part of the discussion concerning the sub-claims asserted in ground three of the pending federal petition. (<u>See</u> V.C., *ante*.)

Applicable Legal Standards

The court may grant habeas relief on a prosecutorial misconduct claim only if the misconduct rises to the level of a due process violation. <u>Sechrest v. Ignacio</u>, 549 F.3d 789, 807

52

1   (9th Cir. 2008).  A violation of a defendant's rights occurs if the government knowingly uses

2   false evidence in obtaining a conviction.  <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972);

3   <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  It is clearly established that "a conviction obtained

4   by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood

5   that the false testimony could have affected the jury's verdict.  <u>United States v. Bagley</u>, 473 U.S.

6   667, 680 n.9 (1985); <u>see also</u> <u>Morales v. Woodford</u>, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The

7   due process requirement voids a conviction where the false evidence is 'known to be such by

8   representatives of the State'") (quoting <u>Napue</u>, 360 U.S. at 269).  Due process is violated in such

9   circumstances regardless of whether the false testimony was obtained through the active conduct

10  of the prosecutor, or was unsolicited.  <u>Napue</u>, 360 U.S. 269 ("[t]he same result obtains when

11  the State, although not soliciting false evidence, allows it to go uncorrected when it appears");

12  <u>Hysler v Florida</u>, 315 U.S. 411 (1942); <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935).  This rule

13  applies even where the false testimony goes only to the credibility of the witness.  <u>Napue</u>, 360

14  U.S. at 269; <u>Hayes v. Brown</u>, 399 F.3d 972, 986 (9th Cir. 2005).

15          To establish a claim where a prosecutor has purportedly introduced perjured testimony,

16  the petitioner must first establish that the testimony was false.  <u>United States v. Polizzi</u>, 801 F.2d

17  1543, 1549-50 (9th Cir. 1986).  Next, the petitioner must demonstrate that the prosecution

18  knowingly used the perjured testimony.  <u>Id</u>. And lastly, the petitioner must show that the false

19  testimony was material.  <u>United States v. Juno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003).  False

20  evidence is material "if there is any reasonable likelihood that the false [evidence] could have

21  affected the judgment of the jury."  <u>Hein v. Sullivan</u>, 601 F.3d 897, 908 (9th Cir. 2010) (quoting

22  <u>Bagley</u>, 473 U.S. at 678).  Mere speculation regarding these factors is insufficient to meet the

23  required burden on the petitioner.  <u>United States v. Aichele</u>, 941 F.2d 761, 766 (9th Cir. 1991).

24          In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that

25  the suppression by the prosecution of evidence favorable to an accused upon request violates due

26  process where the evidence is material either to guilt or to punishment, irrespective of the good

27  faith or bad faith of the prosecution."  The duty to disclose such evidence is applicable even

28  though there has been no request by the accused.  <u>United States v. Agurs</u>, 427 U.S. 97, 107

53

1  (1976).  The duty encompasses impeachment evidence in addition to exculpatory evidence.

2  Bagley, 473 U.S. at 676.  A Brady violation may also occur when the government fails to turn

3  over evidence that is "known only to police investigators and not to the prosecutor."  Youngblood

4  v. West Virginia, 547 U.S. 867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 438

5  (1995) ["the individual prosecutor has a duty to learn of any favorable evidence known to the

6  others acting on the government's behalf in the case, including the police"]).

7      As stated in Strickler v. Greene, 527 U.S. 263, 281-82 (1999), three components are

8  required to establish a Brady violation: "[t]he evidence at issue must be favorable to the accused,

9  either because it is exculpatory, or because it is impeaching; the evidence must have been

10  suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  See

11  also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir.

12  2005).  "The prosecutor, although 'not required to deliver his entire file to defense counsel,' is

13  required to turn over evidence that is both favorable to the defendant and material to the case."

14  Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting Bagley, 473 U.S. at 675).

15      A defendant is prejudiced by a Brady violation if the evidence that was not produced is

16  material.  Amado v. Gonzalez, 758 F.3d at 1134.  Evidence is material if "'there is a reasonable

17  probability' that the result of the trial would have been different if the suppressed documents had

18  been disclosed to the defense."  Strickler, 527 U.S. at 289.  "The question is not whether

19  petitioner would more likely than not have received a different verdict with the evidence, but

20  whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy

21  of confidence."  Id. (quoting Kyles, 514 U.S. at 434); see also Silva, 416 F.3d at 986.  Once the

22  materiality of the suppressed evidence is established, no further harmless error analysis is

23  required.  Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986. "When the government has

24  suppressed material evidence favorable to the defendant, the conviction must be set aside."  Silva,

25  416 F.3d at 986.

26                Analysis

27      As previously discussed, the prosecutor's question to Bain – resulting in the jury learning

28  of petitioner's prior conviction for assault with a firearm – occurred on redirect examination and

1    was proper follow up after petitioner's counsel questioned Bain on cross-examination.

2    Petitioner's counsel opened the door for admission of this evidence when he asked Bain whether

3    she considered petitioner to be a violent person; Bain responded petitioner was a "nonviolent

4    person," allowing for the prosecutor to ask during rebuttal whether Bain was aware of petitioner's

5    prior conviction.

6          There was no prosecutorial misconduct.  "[I]ncorporating inadmissible evidence into

7    questioning can constitute prosecutorial misconduct."  United States v. Sine, 493 F.3d 1021, 1032

8    n. 8 (9th Cir. 2007) (citing United States v. Sanchez, 176 F.3d 1214, 1222 (9th Cir.1999)).

9    However, "the 'opening the door' principle allows parties 'to introduce evidence on the same

10   issue to rebut any false impression that might have resulted from the earlier admission.'"  Id. at

11   1037 (quoting United States v. Whitworth, 856 F.2d 1268, 1285 (9th Cir. 1988)).  Here, Bains's

12   testimony that she believed petitioner to be a non-violent person left a misleading impression and

13   opened the door to evidence to rebut that impression.  See United States v. Mendoza-Prado, 314

14   F.3d 1099, 1105 (9th Cir. 2002) (per curiam) (holding that testimony that implied that defendant

15   was law-abiding and hard-working opened the door to rebuttal evidence); United States v. Garcia-

16   Guizar, 160 F.3d 511, 522 (9th Cir. 1998) ("We have emphasized that [w]here the defendant

17   opens the door to an argument, it is fair advocacy for the prosecution to enter" [citations &

18   internal quotation marks omitted]); Fletcher v. Soto, 693 Fed. Appx. 724, 727 (9th Cir. 2017) (no

19   prosecutorial misconduct because the challenged testimony arose only after petitioner opened the

20   door to it).  The undersigned disagrees with petitioner's assertion that the "prosecutor utilized Ms.

21   Bain to introduce this evidence" as the issue arose only after petitioner's counsel elicited Bain's

22   testimony that petitioner was a nonviolent person on cross-examination.  The prosecutor fairly

23   inquired into the area on rebuttal.

24         Given the foregoing, the undersigned agrees with respondent that petitioner "has not even

25   established that the prosecutor engaged in any improper questioning, much less that the state

26   superior court's ruling contravened any clearly established Supreme Court precedent" (ECF No.

27   13 at 46).  The undersigned further agrees that even if the prosecutor's question amounted to

28   error, any such error did not have a substantial and injurious effect on the jury's verdict.  As noted

elsewhere in these findings, there was substantial evidence of petitioner's guilt apart from any

reference to petitioner's prior conviction, as well as any prejudice arising from the reference,

allowing for, at a minimum, fairminded jurists to disagree.  For these reasons, the undersigned

recommends this claim be denied.

VI.  <u>Conclusion</u>

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."    If petitioner files

objections, she shall also address whether a certificate of appealability should issue and, if so,

why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253

"only if the applicant has made a substantial showing of the denial of a constitutional right."  28

U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen

days after service of the objections.  The parties are advised that failure to file objections within

the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

F.2d 1153, 1156 (9th Cir. 1991).

Dated:  December 14, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Mart2597.157